SULLIVAN, SECRETARY OF HEALTH AND HUMAN
SERVICES, ET AL. *v.* EVERHART ET AL.

No. 88–1323.   Argued November 27, 1989—Decided February 21, 1990

84

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and KENNEDY, JJ., joined, *post*, p. 96.

*Amy L. Wax* argued the cause *pro hac vice* for petitioners. With her on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Merrill*, and *William Kanter.*

*Linda J. Olson* argued the cause for respondents. With her on the brief were *R. Eric Solem* and *Daniel M. Taubman.**

JUSTICE SCALIA delivered the opinion of the Court.

If the Secretary of Health and Human Services determines that a beneficiary has received "more or less than the correct

---

* *Cathy Ventrell-Monsees* and *Peter Komlos-Hrobsky* filed a brief for the American Association of Retired Persons et al. as *amici curiae* urging affirmance.

amount of payment," the Social Security Act requires him to effect "proper adjustment or recovery," subject to certain restrictions in the case of overpayments. This case requires us to decide whether the Secretary's so-called "netting" regulations, under which he calculates the difference between past underpayments and past overpayments, are merely a permissible method of determining whether "more or less than the correct amount of payment" was made, or are instead, as to netted-out overpayments, an "adjustment or recovery" that must comply with procedures for recovery of overpayments imposed by the Act.

## I

Two statutory benefit programs established by the Social Security Act (Act) are involved: the Old-Age, Survivors, and Disability Insurance program (OASDI), 53 Stat. 1362, as amended, 42 U. S. C. § 401 *et seq.* (1982 ed. and Supp. V), and the Supplemental Security Income program (SSI), 86 Stat. 1465, 42 U. S. C. § 1381 *et seq.* (1982 ed. and Supp. V). Millions of Americans receive benefits under these programs; inevitably, some beneficiaries occasionally receive more than their entitlement, and others less. The OASDI program provides the following procedure for correcting such errors:

> "Whenever the Secretary finds that more or less than the correct amount of payment has been made to any person under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Secretary, as follows:

> "(A) With respect to payment to a person of more than the correct amount, the Secretary shall decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such overpaid person or his estate to refund the amount in excess of the correct amount, or shall decrease any payment under this subchapter payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis of the payments to such over-

paid person, or shall apply any combination of the foregoing. . . .

"(B) With respect to payment to a person of less than the correct amount, the Secretary shall make payment of the balance of the amount due such underpaid person . . . ." Act §§ 204(a)(1)(A); (B); 42 U. S. C. §§ 404(a)(1)(A), (B) (1982 ed., Supp. V).

As to overpayments, the Act provides:

"In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience." Act § 204(b); 42 U. S. C. § 404(b) (1982 ed.).

The provisions regulating payment errors in the SSI program are substantially similar.* *Califano* v. *Yamasaki*, 442 U. S. 682, 697 (1979), held that the limitation on adjustment or recovery of overpayments imposed by § 204(b) of the Act

---

* "(A) Whenever the Secretary finds that more or less than the correct amount of benefits has been paid with respect to any individual, proper adjustment or recovery shall, subject to the succeeding provisions of this subsection, be made by appropriate adjustments in future payments to such individual or by recovery from such individual or his eligible spouse (or from the estate of either) or by payment to such individual or his eligible spouse . . . .

"(B) The Secretary (i) shall make such provision as he finds appropriate in the case of payment of more than the correct amount of benefits with respect to an individual with a view to avoiding penalizing such individual or his eligible spouse who was without fault in connection with the overpayment, if adjustment or recovery on account of such overpayment in such case would defeat the purposes of this subchapter, or be against equity and good conscience, or (because of the small amount involved) impede efficient or effective administration of this subchapter . . . ." Act §§ 1631(b)(1)(A), (B); 42 U. S. C. §§ 1383(b)(1)(A), (B) (1982 ed., Supp. V).

gives recipients the right to an oral hearing at which they may attempt to convince the Secretary to waive recoupment.

In the provisions set forth above, the Act contemplates that the Secretary will "fin[d] [whether] more or less than the correct amount" of payment has been made. Elsewhere, it confers upon the Secretary general authority to "make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions," Act § 205(a), 42 U. S. C. § 405(a) (1982 ed.); see also Act § 1631(d)(1), 42 U. S. C. § 1383(d)(1) (1982 ed., Supp. V) (SSI). Pursuant to that authority, the Secretary promulgated the regulations at issue here. The SSI regulation provides:

> "The amount of an underpayment or overpayment is the difference between the amount paid to a recipient and the amount of payment actually due such recipient for a given period. An overpayment or underpayment period begins with the first month for which there is a difference between the amount paid and the amount actually due for that month. The period ends with the month the initial determination of overpayment or underpayment is made." 20 CFR § 416.538 (1989).

The OASDI regulation unhelpfully provides that "[t]he amount of an overpayment or underpayment is the difference between the amount paid to the beneficiary and the amount of the payment to which the beneficiary was actually entitled," 20 CFR § 404.504 (1989), but the Secretary has interpreted this as embodying the methodology set forth in the SSI regulation. Dept. of Health and Human Services, Social Security Ruling 81–19a (cum. ed. 1981).

Two hypotheticals will illustrate the operation of the netting regulations. Mr. A, entitled to $100 per month, is erroneously paid $80 in January and erroneously paid $150 in February. In March, the Secretary determines that these payments were incorrect, nets the errors (*i. e.*, calculates the difference between the underpayment and the overpayment),

and seeks to recover the net overpayment of $30.    Mrs. B, also entitled to $100 per month, receives $50 in April and $110 in May.    In June, the Secretary makes the incorrect payment determination, nets the errors, and pays out $40. In neither case may the beneficiary seek to have the underpayment and the overpayment treated separately: Mr. A could not demand $20 for January and seek a waiver of the recoupment of $50 for February, and Mrs. B could not demand $50 for April and seek a waiver for the $10 in May.

In the present case, the Secretary made both underpayments and overpayments to each of the respondents, and netted those errors pursuant to the regulations.    He determined that three respondents (the original plaintiffs) received net underpayments, and paid that net amount.    The other respondents (intervenors below) received net overpayments, and the Secretary offered them hearings to determine whether recoupment should be waived as to the net overpayment.    The plaintiffs (later joined by the intervenors) filed this suit under §§ 205(g) and 1631(c)(3) of the Act, 42 U. S. C. §§ 405(g), 1383(c)(3) (1982 ed.), in the United States District Court for the District of Colorado.    They claimed that the netting regulations were facially invalid because (1) they were contrary to the Act and (2) they violated beneficiaries' rights to procedural due process.    The District Court granted respondents' motion for summary judgment on the former ground, and the Court of Appeals for the Tenth Circuit affirmed in all relevant respects.    *Everhart* v. *Bowen*, 853 F. 2d 1532 (1988).    The court noted that two other Courts of Appeals had upheld the netting regulations against similar attacks.    *Id.*, at 1536–1537 (citing *Lugo* v. *Schweicker*, 776 F. 2d 1143 (CA3 1985), and *Webb* v. *Bowen*, 851 F. 2d 190 (CA8 1988)).

We granted certiorari.    490 U. S. 1080 (1989).

## II

Our mode of reviewing challenges to an agency's interpretation of its governing statute is well established: We first

ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988); see also *Mead Corp.* v. *Tilley*, 490 U. S. 714, 722–723 (1989). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," *Chevron, supra*, at 843, that is, whether the agency's construction is "rational and consistent with the statute," *NLRB* v. *Food and Commercial Workers*, 484 U. S. 112, 123 (1987). These principles apply fully to the Secretary's administration of the Act. See *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 43 (1981); *Batterton* v. *Francis*, 432 U. S. 416, 425 (1977).

## A

We first consider whether the Act speaks directly to the validity of the netting regulations. Two provisions are relevant: a general authorization and a specific limitation. First, the Act authorizes the Secretary to determine whether "more or less than the correct amount" has been paid. 42 U. S. C. §§ 404(a)(1), 1383(b)(1)(A) (1982 ed., Supp. V). The Act does not define the term "correct amount." It assuredly *could* be construed to refer to the amount properly owing *for a given month*. If that were the only possible interpretation, respondents would prevail, since the netting regulations ascertain the correct amount for a longer time period. But the Act does not foreclose a more expansive interpretation of "correct amount," viz., the amount properly owing *as of the date of the determination.* Although the Act elsewhere describes OASDI and SSI as monthly benefit programs, *e. g.,*

Act § 202(a), 42 U. S. C. § 402(a) (1982 ed., Supp. V); Act § 1611(c)(1), 42 U. S. C. § 1382(c)(1) (1982 ed., Supp. V), it nowhere specifies that the correctness of payments must be determined on a month-by-month basis.

The fuller context of the OASDI provisions suggests that Congress, in authorizing the Secretary to determine whether the "correct amount" was paid, did not prohibit him from making that determination for more than a monthly time period. The Act authorizes a determination of whether "the correct amount of *payment* has been made," 42 U. S. C. § 404(a)(1) (1982 ed., Supp. V), and mandates adjustments "[w]ith respect to *payment* to a person of more than the correct amount," § 404(a)(1)(A), and "[w]ith respect to *payment* to a person of less than the correct amount," § 404(a)(1)(B). If Congress had in mind only shortfalls or excesses in individual monthly payments, rather than in the overall payment balance, it would have been more natural to refer to "the correct amount of *any payment*," and to require adjustment "with respect to *any payment* . . . of less [or more] than the correct amount." This terminology is used elsewhere in § 204(a)(1)(A), whenever individual monthly payments are at issue ("the Secretary shall decrease *any payment* under this subchapter to which such overpaid person is entitled"; "shall decrease *any payment* under this subchapter payable to his estate"). 42 U. S. C. § 404(a)(1)(A) (1982 ed., Supp. V) (emphases added). Moreover, the provision governing adjustment of overpayments to a deceased beneficiary seems to contemplate computation on a multipayment basis ("[T]he Secretary . . . shall decrease any payment under this subchapter payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis *of the payments to such overpaid person*"). *Ibid.* (emphasis added).

The Act's provisions governing SSI are slightly different, but in no way contradict the Secretary's position. They au-

thorize the Secretary to determine whether "more or less than the correct amount of *benefits* has been paid," 42 U. S. C. § 1383(b)(1)(A) (1982 ed., Supp. V) (emphasis added). Had this read "more or less than the correct amount of *any benefit*" it might support respondents' position, but as written it at least bears (if it does not indeed favor) the interpretation that more than a single monthly benefit is at issue.

Respondents nevertheless maintain, as did the Court of Appeals, that another provision of the Act directly precludes the Secretary from netting underpayments and overpayments. They point to § 204(b), 42 U. S. C. § 404(b) (1982 ed.), which provides: "In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience." See also Act § 1631(b)(1)(B), 42 U. S. C. § 1383(b)(1)(B) (1982 ed., Supp. V) (SSI). Respondents argue that by using the phrase "adjustment or recovery," Congress intended to subject to this requirement all collection methods, including the setoff effected by netting. They claim this broad meaning is given to the words "adjustment" and "recovery" by other Social Security regulations (*e. g.*, 20 CFR §§ 404.502–404.503 (1989)), common usage (*e. g.*, Webster's Third New International Dictionary 27, 1898 (1981) (hereinafter Webster's)), and general legal usage (*e. g.*, *United States* v. *Burchard*, 125 U. S. 176 (1888)). Under this interpretation, when the agency calculates the difference between, or nets, Mr. A's $20 underpayment and his $50 overpayment, see *supra*, at 87–88, it has engaged in "adjustment or recovery," but without complying with the restrictions on "adjustment or recovery" that the Act imposes.

In our view, however, with this provision as with those discussed earlier, respondents have established at most that the language may bear the interpretation they desire—not that it

cannot bear the interpretation adopted by the Secretary. "Adjustment" *can* have the more limited meaning (which the Secretary favors) of "an increase or decrease" of payments (Webster's 27), and "recovery" *can* have the more limited meaning of "get[ting] back" payments already made (see *id.*, at 1898 ("recover")). Moreover, other provisions of the Act support this limited meaning. It is at least reasonable, if not necessary, to read the phrase "adjustment or recovery" in § 204(b) *in pari materia* with the identical phrase in § 204(a)(1). The latter section directs the Secretary, if he finds that incorrect payment has been made, to make "proper adjustment or recovery . . . *as follows.*" In the case of overpayment, he shall "decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such overpaid person or his estate to refund the amount in excess of the correct amount . . . ." 42 U. S. C. § 404(a)(1)(A) (1982 ed., Supp. V). As to SSI, "adjustment or recovery shall . . . be made by appropriate adjustments in future payments to such individual or by recovery from . . . or by payment to such individual or his eligible spouse . . . ." 42 U. S. C. § 1383(b)(1)(A) (1982 ed., Supp. V). Giving the terms their more limited meaning does not produce absurd policy consequences. Reducing future benefits, or requiring the beneficiary to pay over cash, will ordinarily produce more hardship than merely setting off past underpayments and overpayments. It is not at all unreasonable to think that waiver hearings were established only for the former.

As used in the Act, therefore, adjustment can be read to mean decreasing future payments, and recovery to mean obtaining a refund from the beneficiary. Under this interpretation, when the agency nets Mr. A's underpayment against his overpayment, it is not engaged in "adjustment or recovery," but only in the calculation of whether "more or less than the correct amount of payment has been made." Only *after* making that calculation does the Secretary take the additional step of rectifying any error by "adjustment" (increas-

ing or decreasing future payments) or "recovery" (obtaining a refund from the beneficiary). And it is only this latter step that is governed by § 204(b) of the Act. We do not say this is an inevitable interpretation of the statute; but it is assuredly a permissible one.

### B

Since the Act reasonably bears the Secretary's interpretation that netting is permitted, only one issue remains: Respondents contend that the manner in which the regulations provide for netting to be conducted is arbitrary and capricious, because of their definition of the netting period. Overpayments are netted with underpayments up to the "month [of] the initial determination" of error. 20 CFR § 416.538 (1989). "Initial determination" is a term of art meaning the Secretary's formal determination that an error was committed. See 20 CFR §§ 404.902, 416.1402 (1989). Needless to say, that formal determination will not be simultaneous with the Secretary's first discovery that something is amiss; delay is inevitable. Respondents contend that this delay is fatal. At best, they say, the period over which netting is conducted will turn on the fortuity of the time period between discovery and formal determination. At worst, the Secretary will manipulate the netting period by delaying formal determination, thus including more underpayments in the netting period and reducing the net overpayment subject to the recoupment-waiver procedures.

It seems to us not arbitrary or capricious to establish a grace period within which these determinations can be considered and formally made; they should not be spur-of-the-moment decisions. That delay will extend the netting period, and may result in the inclusion of more underpayments to be netted. But we cannot say that the alternatives — immediate determinations, or determinations within a fixed period—would not produce errors that make beneficiaries worse off on the whole.

Moreover, although the Secretary's regulations do not establish a fixed time period for the formal determination, they do establish a time limit upon the principal adverse consequence of delay: the netting-in of additional underpayments. The regulations provide:

"Where an apparent overpayment has been detected but determination of the overpayment has not been made (see § 416.558(a)), a determination and payment of an underpayment which is otherwise due cannot be delayed unless a determination with respect to the apparent overpayment can be made before the close of the month following the month in which the underpaid amount was discovered." 20 CFR § 416.538 (1989).

See also Dept. of Health and Human Services, Program Operations Manual System, GN 02201.002 (1989) (Social Security Administration policy to resolve overpayments as quickly as possible). Respondents' fear of intentional manipulation of the netting period can be entirely dismissed if this provision is observed in good faith—as we must presume, in this facial challenge, it will be. See, *e. g.*, *FCC* v. *Schreiber*, 381 U. S. 279, 296 (1965). The intentional manipulation hypothesis is in any event implausible. Deliberately protracting the netting period may indeed draw in future underpayments; but it may just as likely draw in future overpayments, which will be uncollectible until the Secretary's determination is made. The Secretary might conceivably ensure that delay works to the Government's financial advantage by *deliberately* underpaying while keeping the netting period open, but since that is an obvious violation of the Act it is again not the stuff of which a facial challenge can be constructed.

In addition to the fact that the disadvantages of the Secretary's approach are less than respondents assert, the disadvantages of respondents' approach are more. The Secretary points out that a separate accounting for each month would cause the agency great expense, in the cost of a greatly in-

creased volume of complex recoupment-waiver proceedings, in the cost of overpayments that are simply written off because the cost of the proceedings would exceed the recovery, and in the cost of overpayments whose return will be subject to lengthy delays. These expenses "in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." *Mathews* v. *Eldridge*, 424 U. S. 319, 348 (1976).

Respondents seek to minimize the administrative burden by proposing a scheme under which the Secretary would notify the beneficiary of underpayments and overpayments, withhold reimbursement of the underpayments for a brief period during which the beneficiary may seek waiver of recoupment of overpayments, and then net the underpayments and that portion of the overpayments as to which waiver has not been sought. This scheme, however, does not at all address the problem of delay in netting that is the asserted basis for finding the regulations arbitrary and capricious. Substituting "notification" of underpayments and overpayments for "determination" of underpayments and overpayments merely gives the occasion for the delay another name. What this alternative proposal of respondents really puts forward is an alternative means of assuring that overpayments cannot be "netted out" without an opportunity for waiver hearing. As we discussed at length earlier, the statute does not require such assurance. In sum, we find no basis for holding the regulations arbitrary and capricious.

\* \* \*

The Court of Appeals did not reach respondents' contention that the regulations violate due process, and we will not address that claim in the first instance. See, *e. g.*, *United States* v. *Sperry Corp.*, 493 U. S. 52, 66 (1989). Accordingly, the judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE KENNEDY join, dissenting.

The kingly power to rewrite history has not been delegated to the Secretary of Health and Human Services. Nevertheless, the Secretary now claims authority to determine that no underpayment has been made to a beneficiary who concededly received a deficient monthly payment. The majority accepts this argument. Because I believe this result inconsistent with both common sense and the plain terms of the statute, I respectfully dissent.

The Social Security Act (Act), 42 U. S. C. § 401 *et seq.* (1982 ed. and Supp. V), establishes the Old-Age, Survivors, and Disability Insurance program (OASDI) and the Supplemental Security Income program (SSI). By enacting this legislation, Congress authorized the Secretary to make monthly payments to literally millions of elderly and needy beneficiaries. Anticipating that there will inevitably be many occasions on which such a payment is more or less than the correct amount, Congress directed the Secretary to prescribe regulations outlining the procedure for remedying overpayments and underpayments.

In the vast majority of cases, these procedures are uncontroverted. We deal today only with a narrow category of disputed cases in which claimants assert rights designed to protect specially disadvantaged beneficiaries. Respondents, like the plaintiffs in *Califano* v. *Yamasaki*, 442 U. S. 682 (1979), wish to compel the Secretary to waive his claim for recoupment of an overpayment. See 42 U. S. C. § 404(b) (1982 ed.) (§ 204(b) of the Act) and 42 U. S. C. § 1383(b)(1) (B)(i) (1982 ed., Supp. V) (§ 1631(b)(1)(B)(i) of the Act) (requiring waiver by the Secretary under certain circumstances). The Secretary protests that allowing these waivers would burden the benefits program with "great expense" and a "greatly increased volume of complex . . . proceedings." *Ante*, at 94. The Secretary's fears are, of course, irrelevant if the statute commands him to honor respondents'

waiver requests. Moreover, we noted in *Yamasaki* that in 1977 the average overpayment to OASDI beneficiaries exceeded $500, but that only 3.4 percent of the overpaid persons requested that the Secretary waive recoupment. 442 U. S., at 686, n. 2. Thus, although § 204(b) applies as a legal matter to all OASDI cases in which "more than the correct amount of payment has been made," our decision today applies as a practical matter only to about 3.5 percent of OASDI overpayments. Even this category encompasses overpayments not implicated by respondents' complaint, however. The present controversy affects only those cases in which the Secretary attempts to recoup an overpayment by netting it together with an underpayment, *and* in which the beneficiary seeks a waiver. We address, in short, the claims of a subset of the minority of overpaid beneficiaries who seek waivers.[1]

With respect to these beneficiaries, as in all other cases involving overpayments, Congress has given the Secretary explicit mandatory instructions. Those instructions require him to recognize that any case in which "more than the correct amount of payment has been made" involves a factual event that cannot be ignored. The Secretary cannot erase the historical record or pretend that the overpayment never occurred simply because later events alter the significance of earlier ones.

This is what the statutory command says about OASDI overpayments:[2]

---

[1] The Secretary's argument becomes especially weak if this subset is very large. If the Secretary can evade the waiver provisions by netting overpayments against underpayments, and if netting is possible in most cases, then the Secretary's procedures would effectively nullify the waiver provisions. Such a consequence would be strong evidence that the Secretary's procedures are inconsistent with the statute. See, *e. g., Colautti* v. *Franklin,* 439 U. S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative").

[2] SSI overpayments subject the Secretary to a similar command. Section 1631(b)(1)(B)(i) of the Act, 42 U. S. C. § 1383(b)(1)(B)(i) (1982 ed., Supp. V), reads: "The Secretary . . . shall make such provision as he finds

"In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience." § 204(b) of the Act; 42 U. S. C. § 404(b) (1982 ed.).

We have previously recognized that this provision "concerning the fact of the overpayment" speaks in "the imperative voice" and requires that "'there shall be no adjustment of payments to, or recovery by the United States from, any person' who qualifies for waiver." *Califano* v. *Yamasaki*, 442 U. S., at 693–694.

As the Court of Appeals for the Tenth Circuit observed, by this provision and its SSI counterpart the "statute makes a clear differentiation" between overpayments and underpayments. *Everhart* v. *Bowen*, 853 F. 2d 1532, 1537 (1988). "While the provisions relating to underpayments mandate payment without qualification, the recovery of overpayment provisions are qualified by the waiver of recoupment procedures." *Ibid.* The reason for this distinction is easily surmised. A needy person who unknowingly receives an overpayment may spend it, not realizing that the Government will later take back money by reducing needed benefits, or by refusing to compensate for a prior underpayment. The beneficiary may be left without money essential to pay monthly bills. Thus, as Judge Gibbons has observed, the "difference in treatment of overpayments and underpayments . . . is quite consistent with the fundamental policy

appropriate in the case of payment of more than the correct amount of benefits with respect to an individual with a view to avoiding penalizing such individual or his eligible spouse who was without fault in connection with the overpayment, if adjustment or recovery on account of such overpayment in such case would defeat the purposes of this subchapter, or be against equity and good conscience, or (because of the small amount involved) impede efficient administration of this subchapter."

motivating Congress in enacting both Titles; namely assuring those most in need in our society that they will receive a monthly benefit which will from month to month provide for the necessities of life." *Lugo* v. *Schweiker*, 776 F. 2d 1143, 1154 (CA3 1985) (dissenting opinion). The procedures at issue here, however, "treat overpayments and underpayments equally," *Everhart*, 853 F. 2d, at 1537, thereby deviating from both the letter and the purpose of the statutory command.

If we use two typical cases involving a $500 overpayment as examples, we can readily see how the Secretary's "netting regulations" violate the statutory command. In the first example, we may assume that the $500 overpayment was made in 1978 and first discovered in 1988. If we further assume that the beneficiary was without fault and that it would have been against equity and good conscience to recoup that amount from him in 1988, it necessarily follows that he had a statutory right to a waiver of any such recoupment. In our second hypothetical example, we may assume the same facts with the addition that in 1988 the beneficiary's monthly checks were erroneously reduced by $250 for each of two months. Under the Secretary's reading of the statute, the beneficiary's request for payment of the balance of the amount due for those two months could be denied on the ground that neither more nor less than the correct amount of payment had been made during the period between 1978 and 1988.

In my view such a reading of the statute is intolerable. The assumption that an underpayment in 1988—whether negligent or deliberate—could extinguish a needy beneficiary's statutory right to request a waiver of recoupment of an overpayment that occurred years earlier is flatly inconsistent with the statutory command that "equity and good conscience" should determine the waiver issue. For the Secretary to pretend that neither more nor less than the correct amount had been paid—when there was not only a series of

incorrect monthly payments in 1978 but also a pair of incorrect payments in 1988—is nothing short of rewriting history to destroy a citizen's valuable statutory right.

In light of the statistics quoted in *Yamasaki*, 442 U. S., at 686, n. 2, we might expect that the Secretary's refusal to recognize waiver requests would injure beneficiaries in less than 4 percent of the netting cases. The illustrative hypotheticals propounded by the majority, which suppose an underpayment and overpayment in quick succession during a 2-month period, *ante*, at 87–88, are most likely typical of the cases in which a beneficiary would elect not to request any waiver. Yet, as Congress foresaw, recoupment of other overpayments may entail much more serious difficulties for the statutory beneficiaries. The Secretary's "netting regulations" cover brief 2-month discrepancies, like the examples invented by the majority, but the regulations also authorize netting over multiyear periods, as was done with respect to the actual respondents in this case. The regulations may thus provide a form of rough justice in 97 percent of the netting cases, but that ratio in no way excuses the injustice that is apparent in true hardship cases. Those cases are few in comparison to the total volume handled by the Secretary. They are, however, of crucial importance to the beneficiaries.

For some beneficiaries the amount at stake is substantial, and the reasons why Congress commanded the Secretary to carefully consider the equities of the particular case are overwhelmingly apparent. Thus, for example, respondent Emil Zwiezen and his wife are both dependent on their monthly Social Security checks of $911. According to the Secretary, Mr. Zwiezen received $9,483 in overpayments between 1978 and 1981. The Secretary, however, failed to give Mr. Zwiezen certain increases in his monthly benefit amount to which he was entitled and, by April 1984, he had accumulated underpayments of $4,376. Although he ultimately received a waiver of the net overpayment remaining after the Secretary subtracted the underpayments, Mr. Zwiezen never had

an opportunity to obtain a waiver of the entire overpayment and thus could not recover any portion of the increases that had been denied to him. According to his affidavit, the resulting shortfall caused this elderly couple to suffer severe emotional and financial consequences. Mr. Zwiezen could not pay his water bills, had fallen behind in his house payments, and feared that his doctor and druggist would stop providing him medical care. Affidavit of Emil Zwiezen, reproduced in Brief for Appellee in No. 87–1839 (CA10), p. 31A. See also *Everhart* v. *Bowen*, 694 F. Supp. 1518, 1519–1520 (Colo. 1988).

The validity of the netting regulations that enabled the Secretary to recover $4,376 from Mr. Zwiezen without giving him the notice and opportunity to request a waiver required by § 204(b) depends on a highly unnatural reading of three statutory provisions. First, the Secretary assumes that no overpayment or underpayment can actually occur until he finds that it has occurred. This assumption is not only foreclosed by the plain language of § 204(b) and § 1631 (b)(1)(B)(i),[3] but also perversely converts a duty to find the facts into a power to change them.

Second, the Secretary assumes that the words "adjustment" and "recovery" in the two prohibitions against inequitable recoupment of overpayments do not apply to either a deliberate or an inadvertent decrease in monthly payments unless the Secretary has previously made a formal finding that an overpayment occurred. As a practical matter this means that either a simple mistake or a deliberate effort to

---

[3] The OASDI provision reads: "In any case in which more than the correct amount of payment has been made, there shall be no adjustment . . . ." 42 U. S. C. § 404(b) (1982 ed.). Notably, the section does not refer to "any case in which the *Secretary finds that* more than the correct amount of payment has been made . . . ."

Likewise, 42 U. S. C. § 1383(b)(1)(B)(i) (1982 ed., Supp. V) applies "in the case of payment of more than the correct amount of benefits . . . ," not merely "in the case *that the Secretary finds* payment of more than the correct amount of benefits."

await underpayments before recognizing overpayments can effect the same adjustment or recovery that the statute expressly prohibits.[4] But "[n]o recovery means no recovery by setoff, and no recovery by suit; no recovery at all." *Lugo* v. *Schweiker*, 776 F. 2d, at 1154 (Gibbons, J., dissenting). The "netting regulations permit the Secretary to accomplish what the waiver provisions plainly and unequivocally forbid; namely a recovery by the United States of overpayments without a hearing on waiver." *Id.*, at 1155 (footnote omitted). In my opinion the words "adjustment" and "recovery" are not such chameleons.

Finally, in a statutory scheme that is replete with references to monthly payments and monthly benefits,[5] the Secretary assumes that the word "payment" as used in §204(a), §204(b), and §1631(b)(1)(B)(i), and the word "benefits" as used in §1631(b)(1)(A), refer to the aggregate amount of numerous payments that may have been made over a period of several years. Indeed, the relevant payment period—instead of the month in which more or less than the correct amount of payment has been made—is in the Secretary's eyes an accordion-like concept that may be expanded to encompass overpayments that occurred in the past or underpayments that are ongoing. "The key to the netting regulations is the Secretary's completely artificial definition of the period for calculation of overpayments and underpayments." *Lugo*, 776 F. 2d, at 1155 (dissenting opinion).

---

[4] The majority speculates that "[d]eliberately protracting the netting period may indeed draw in future underpayments; but it may just as likely draw in future overpayments, which will be uncollectible until the Secretary's determination is made." *Ante*, at 94. This proposition depends, of course, upon the relative frequency of overpayments and underpayments. The majority assumes that the two occur with equal frequency, an assumption for which it offers no support. One might indeed make precisely the opposite assumption: that the Government errs in its own favor more often, and more substantially, than it errs in favor of beneficiaries.

[5] See, *e. g.*, 42 U. S. C. §§ 402(a), 402(j) (1982 and Supp. V); 42 U. S. C. § 1382(c)(1) (1982 ed., Supp. V).

The net effect of these distortions of statutory language is to defeat clear congressional intent. The Secretary contends that we must nevertheless defer to his interpretation of the statute. Relying heavily upon *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), the Secretary would have us believe that his responsibility to construe ambiguous provisions in the statutes he administers confers upon him authority to define away overpayments and underpayments when a program participant has received both. The majority accepts this suggestion. But *Chevron* and its progeny yield the Secretary no such privilege. Because the "judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent," we defer to the administrator's interpretation of a statute only after "employing traditional tools of statutory construction." *Id.*, at 843, n. 9. We have accordingly not hesitated to find that "agency interpretations must fall to the extent they conflict with statutory language." *Public Employees Retirement System of Ohio* v. *Betts*, 492 U. S. 158, 171 (1989). See also *Dole* v. *Steelworkers*, *ante*, p. 26; *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 445–450 (1987).

Indeed, *Califano* v. *Yamasaki*, 442 U. S. 682 (1979), in which we first recognized the hearing right the Secretary has denied to these respondents, itself rejected the Secretary's reading of this statute. Although the statute does not state by express terms that a hearing is essential before the Secretary makes a § 204(b) waiver decision, we nevertheless found it clear in *Yamasaki* that Congress intended that a hearing be held. We analyzed the statute and concluded that "the nature of the statutory standards makes a hearing essential." *Id.*, at 693. The import of the statutory terms in this case is, I believe, equally clear.[6]

---

[6] It is, of course, of no importance that *Yamasaki* predates *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837

The majority, however, refuses to heed the direction of those standards. In so doing, the majority makes much of its conclusion that, had Congress wished to prohibit netting, "it would have been more natural" for Congress to phrase its command in terms of "any payment." *Ante*, at 90. Perhaps that is so.[7] But it is entirely possible that Congress clearly

(1984). As we made clear in *Chevron*, the interpretive maxims summarized therein were "well-settled principles." *Id.*, at 845.

[7] Even this much is far from clear. The majority's suggestion is that Congress could have referred to individual monthly payments, rather than a net transfer, by using the phrase "any payment," rather than simply "payment," in, for example, 42 U. S. C. § 404(b) (1982 ed.). The provision reads in relevant part, "In any case in which more than the correct amount of payment has been made . . . ."

For reasons already stated, I do not believe that this provision is ambiguous. But if it were, the majority's suggestion would not dispell entirely the interpretive difficulties that trouble the majority. The word "payment" embraces two concepts: that of a wealth transfer, and that of a transaction used to effect such a transfer. For this reason, it is possible for a lender to tell a borrower that "a series of 15 *payments* will be needed to effect *payment* of the debt." By using the plural form of "payment," the lender focuses attention upon several transactions, rather than the transfer accomplished by the transactions together. And, indeed, careful examination of the statute, the majority opinion, and this dissent will show that all three frequently distinguish transactions from transfer by invoking the plural, "payments."

The majority wisely declines to suggest that Congress should have used the plural in § 404(b) to prohibit netting. That option was not available for two reasons. First, we are imagining how Congress might redraft the section to refer more specifically to a single defective *payment*, and *not* to multiple *payments*. Had Congress referred to the "correct amount of *payments*," readers would have believed that Congress was referring, albeit awkwardly, to the *number* of transactions, rather than to the amount of an individual transaction. Second, although we are assuming that Congress does not wish to refer to the *comprehensive* transfer effected by multiple payments together, Congress must refer to the *subsidiary* transfer accomplished by the transaction in question: it is precisely the abnormality of that transfer which makes the transaction of interest. We are dealing, in short, with a payment of improper payment.

As already noted, the majority proposes to solve this problem by inserting the word "any" before "payment." But the adjective begs the ques-

intended to prohibit any netting that diminishes waiver rights, but nonetheless did not have the netting problem in mind when drafting language relevant to overpayments and

---

tion. "Any payment" may differ from "payment" not by distinguishing a single transaction or transfer from the aggregate of all such transfers, but rather by distinguishing all possible such aggregate transfers from some paradigmatic group of aggregate transfers. The word "any" arguably makes the subsection applicable to *any and all* possible payments. In other words, the introductory clause to the redrafted version of § 404(b) would include the word "any" twice—"In *any* case in which more than the correct amount of *any* payment has been made . . ."—but the majority and the Secretary could continue to make in the face of two "anys" the argument they now make in the face of one. The second "any" would rule out exceptions to the general rule without explaining whether the general rule applied to transfers or transactions: the revised statute might be read to mean that the Secretary must provide for waiver by any and all beneficiaries of any and all net overpayments. This may not be the most obvious interpretation, but, to use the majority's own phrase, the proposed language "reasonably bears" this interpretation. *Ante*, at 93. Accordingly, the majority would apparently have to permit netting by the Secretary even if confronted by its own proposed clear expression of congressional intent to prohibit netting.

The Congress which the majority imagines would thus have to search for other means to express its intent. One possible attempt is actually in the statute. Congress uses the awkward phrase, "correct amount of payment has been made." The educated layman may cringe on hearing this legalism; "correct amount has been paid" seems to say as much and more crisply. Why add the bulky "of payment"? It is at least possible that Congress hoped to focus attention on individual payments: the "of payment" reminds the reader that "amounts" due are not simply due in total, but due in regular installments—denominated "payments." This point is obviously not dispositive, but it is more plausible than the majority's discussion of "any payment."

Of course, Congress could have obviated the need for any such analysis by inserting into the statute a reference to payments in individual months, or simply by saying: "The Secretary shall not net underpayments and overpayments." My point is not that a more precise statute is impossible, however; my point is only that the interpretive difficulties posed by the statute cannot reasonably be ascribed to a conscious delegation, to the absence of intent, or to inability to forge a coalition. See *Chevron*, 467 U. S., at 865. Rather, the interpretive problems pending before us result

underpayments. The netting procedure here is so inconsistent with the mandatory character of the waiver provision,[8] with the statutory terms discussed above, and with the statute's reference to "equity and good conscience," that Congress might simply have thought it unnecessary to add further language ruling out specifically any such program. In any event, the majority's argument is irrelevant.[9] Just as we do not sit to supply statutory directives where Congress gave none, we likewise do not sit to insist that Congress express its intent as precisely as would be possible. Our duty is to ask what Congress intended, and not to assay whether Congress might have stated that intent more naturally, more artfully, or more pithily.

In this case it is clear beyond peradventure that Congress intended to ensure that needy citizens would receive their full monthly benefit checks, even if that policy sometimes means forgoing any opportunity the Government might have to recoup an earlier overpayment. The Secretary's reading of the statute puts an unreasonable strain upon both its words and its purpose. If context were ignored entirely, I suppose that a student of language could justify the Secretary's interpretation of "adjustment" and "payment," and his duty to find historical facts. Perhaps that is what the majority means when it says that the statutory language "reason-

---

from an imprecision inherent in the concept of payment. That sort of imprecision is inevitable in political language. See The Federalist No. 37, p. 230 (E. Earle ed. 1937) (James Madison on the nature of imprecision in political concepts).

[8] See *Yamasaki*, 442 U. S., at 693–695.

[9] In *Yamasaki*, for example, we interpreted the statute to confer a hearing right, even though Congress never used the word "hearing." One might argue that if Congress wished to establish a hearing right, "it would be more natural" for Congress to draft a statute that mentioned hearings expressly. The *Yamasaki* Court supplied the proper answer to this objection: whether or not reference to hearings would be more natural, it is unnecessary, since the hearing right inheres in "the nature of the statutory standards." *Id.*, at 693.

ably bears," *ante*, at 93, the Secretary's argument. But I find it inconceivable that wise judges can conclude that regulations in which the Secretary delegates to himself the power to rewrite history are "based on a permissible construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S., at 843.

I respectfully dissent.