900 F.2d 311
 1990 A.M.C. 1225, 283 U.S.App.D.C. 327
 CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,
v.
FEDERAL MARITIME COMMISSION, and United States of America, Respondents,
Transpacific Westbound Rate Agreement, Trans-Pacific Freight
Conference of Japan, et al., North Europe-U.S. Pacific
Freight Conferences, et al., American Paper Institute, U.S.
Atlantic-North Europe Conferences, et al., Asia North
America Eastbound Rate Agreement, et al., National
Industrial Transportation League, Intervenors.
E.I. DUPONT DE NEMOURS & COMPANY, Petitioner,
v.
FEDERAL MARITIME COMMISSION, and United States of America, Respondents,
Asia North America Eastbound Rate Agreement, et al., U.S.
Atlantic-North Europe Conference, et al., North Europe-U.S.
Pacific Freight Conferences, et al., Trans-Pacific Freight
Conference of Japan, et al., Intervenors.
 Nos. 88-1850, 88-1894.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 20, 1989.
Decided April 6, 1990.
 
 On Petition for Review of an Order of the Federal Maritime commission.
 Michael D. Esch, with whom John L. Oberdorfer, Washington, D.C., David F. Zoll, for Chemical Mfrs. Ass'n, Peter A. Friedmann, Portland, Or., and Julie Simon, for E.I. DuPont de Nemours & Co., were on the joint brief, for petitioners in Nos. 88-1850 and 88-1894.
 Robert J. Wiggers, Atty., Dept. of Justice, with whom James F. Rill, Asst. Atty. Gen., Michael Boudin, Deputy Asst. Atty. Gen., and John J. Powers III, Dept. of Justice, Washington, D.C., were on the brief, for respondent, U.S. in Nos. 88-1850 and 88-1894.
 James P. O'Sullivan, Atty., Fed. Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Fed. Maritime Com'n, Washington, D.C., was on the brief, for respondent, Fed. Maritime Com'n, in Nos. 88-1850 and 88-1894.
 R. Frederic Fisher, with whom Lawrence N. Minch, San Francisco, Cal., for Transpacific Westbound Rate Agreement, Howard A. Levy, for North Europe Conferences, Stanley O. Sher, Marc J. Fink and Anne E. Mickey, Washington, D.C., for Asia North America Eastbound Rate Agreement, et al., David Nolan for North Europe U.S. Pacific Freight Conference, et al., Charles F. Warren, George A. Quadrino, Washington, D.C., and Benjamin K. Trogdon, Arlington, Va., for Trans-Pacific Freight Conference, et al., were on the joint brief for intervenors, Ocean Rate Conferences in Nos. 88-1850 and 88-1894.
 William Karas, Washington, D.C., for U.S. Atlantic-North Europe Conference, et al., and F. Conger Fawcett, for North Europe-U.S. Pacific Freight Conferences, et al., also entered appearances for joint intervenors, Ocean Rate Conferences.
 Nicholas J. DiMichael and Mark K. Nasseri, Washington, D.C., entered appearances for intervenor, Nat. Indus. Trans. League in No. 88-1850.
 Peter A. Friedmann, Portland, Or., entered an appearance for intervenor, American Paper Institute in No. 88-1850.
 Before WALD, Chief Judge, RUTH BADER GINSBURG, Circuit Judge, and FRIEDMAN, Senior Circuit Judge.*
 Opinion for the Court filed by Senior Circuit Judge FRIEDMAN.
 FRIEDMAN, Senior Circuit Judge:
 
 
 1
 These petitions to review challenge a decision of the Federal Maritime Commission (Commission) that the Shipping Act of 1984 (Act or 1984 Act), 46 U.S.C.App. Secs. 1701-1720 (Supp. V 1987), permits a conference of ocean common carriers to prohibit its members from using "loyalty contracts," under which a carrier provides lower transportation rates to a shipper who agrees to ship all or a fixed portion of its cargo with the carrier. We affirm.
 
 
 2
 * A. Under the 1984 Act, conferences of ocean common carriers are required to file with the Commission all agreements and modifications thereof that, among other things, "(1) discuss, fix, or regulate transportation rates, including through rates, cargo space accommodations, and other conditions of service; ... and (7) regulate or prohibit the use of service contracts." 46 U.S.C.App. Secs. 1703(a)(1) & (7) (agreements within scope of chapter) and 1704(a) (filing requirements). The Commission is required to "reject" any agreement that does not meet specified requirements. 46 U.S.C.App. Sec. 1705(b). If the Commission does not reject an agreement within specified time limits, the agreement becomes effective. 46 U.S.C.App. Sec. 1705(c). After an agreement has become effective, the Commission may review it to determine its consistency with the Act. 46 U.S.C.App. Sec. 1710(c).
 
 
 3
 The Act makes the antitrust laws inapplicable to specified agreements and activities, including agreements filed under section 1704 that are effective. 46 U.S.C.App. Sec. 1706(a).
 
 
 4
 The Act distinguishes among three types of arrangements between carriers and shippers by which the shipper receives more favorable treatment in return for giving the carrier or its conference a specified portion of its business. These arrangements are loyalty contracts, service contracts, and time-volume rates.
 
 
 5
 The Act defines a "loyalty contract" as "a contract with an ocean common carrier or conference, other than a service contract or contract based upon time-volume rates, by which a shipper obtains lower rates by committing all or a fixed portion of its cargo to that carrier or conference." 46 U.S.C.App. Sec. 1702(14).
 
 
 6
 The Act defines a "service contract" as "a contract between a shipper and an ocean common carrier or conference in which the shipper makes a commitment to provide a certain minimum quantity of cargo over a fixed time period, and the ocean common carrier or conference commits to certain rate or rate schedule as well as a defined service level...." 46 U.S.C.App. Sec. 1702(21).
 
 
 7
 Both loyalty and service contracts are bilateral agreements between a carrier and a shipper. The critical difference between them is that under the former the shipper's commitment is made in terms of a "portion" (i.e., a percentage or fraction) of its cargo, whereas under the latter it is a specified minimum "quantity" of cargo.
 
 
 8
 Although the Act does not define time-volume rates, the filing requirements indicate that the term means rates that "vary with the volume of cargo offered over a specified period of time." 46 U.S.C.App. Sec. 1707(b).
 
 
 9
 The Act provides different filing requirements for (1) loyalty contracts and time-volume rates, 46 U.S.C.App. Sec. 1707(a), and (2) service contracts, 46 U.S.C.App. Sec. 1707(c). The Act requires every water common carrier and conference to file with the Commission "tariffs showing all its rates, charges, classifications, rules, and practices," 46 U.S.C.App. Sec. 1707(a)(1), and provides that these "[t]ariffs shall ... include sample copies of any loyalty contract...." 46 U.S.C.App. Sec. 1707(a)(1)(E). Time-volume rates, like other rates, are required to be filed in "tariffs under subsection (a) of [section 1707]." 46 U.S.C.App. Sec. 1707(b).
 
 
 10
 Service contracts are not required to be filed under section 1707(a). Instead, section 1707(c) requires that "each" service contract (with certain exceptions) "shall be filed confidentially with the Commission, and at the same time, a concise statement of its essential terms shall be filed with the Commission and made available to the general public in tariff format, and those essential terms shall be available to all shippers similarly situated." 46 U.S.C.App. Sec. 1707(c).
 
 
 11
 Unlike service contracts and time-volume rates which, if used pursuant to an effective conference agreement, are covered by the general antitrust immunity for such agreements, "[n]o common carrier ... may ... use a loyalty contract, except in conformity with the antitrust laws...." 46 U.S.C.App. Sec. 1709(b)(9).
 
 
 12
 One other provision of the Act is critical to the issue before us. This is the so-called independent action provision, 46 U.S.C.App. Sec. 1704(b)(8), which requires that each conference agreement
 
 
 13
 provide that any member of the conference may take independent action on any rate or service item required to be filed in a tariff under section 1707(a) ... upon not more than 10 calendar days' notice to the conference and that the conference will include the new rate or service item in its tariff for use by that member, effective no later than 10 calendar days after receipt of the notice, and by any other member that notifies the conference that it elects to adopt the independent rate or service item on or after its effective date, in lieu of the existing conference tariff provision for that rate or service item.
 
 
 14
 B. The present case began in 1987 when the intervenor, Transpacific Westbound Rate Agreement (Transpacific), filed with the Commission an amendment to its basic agreement providing that "[n]o party may enter into a loyalty contract," Art. 5(e), or, by independent action, establish any loyalty contract, Art. 13(h)(ii). The agreement continued to provide, as required by 46 U.S.C.App. Sec. 1704(b)(8), that "any party may take independent action on any rate or service item." Art. 13(a).
 
 
 15
 The Commission issued an order to Transpacific to show cause why the provision barring loyalty contracts did not violate the Act. The Commission broadened the proceeding to cover five other conferences that also had filed amendments to their conference agreement prohibiting loyalty contracts.
 
 
 16
 After full briefing and oral argument, the Commission issued a lengthy opinion upholding the Conference prohibition upon the use of loyalty contracts and dismissed the proceeding. Transpacific Westbound Rate Agreement, Loyalty Contracts, Report & Order, Nos. 87-26 & 88-1 (Oct. 31, 1988) [hereinafter Report & Order ]. Noting that "[b]oth sides have advanced credible arguments in support of their respective positions in their pleadings and at oral argument," slip op. at 30, the Commission concluded that after
 
 
 17
 [h]aving reviewed this record, [and] based on the language of the statute, its extensive legislative history, and the overall purposes and objectives of the 1984 Act ... the use of a loyalty contract is not the type of subject matter that was intended to be covered by the mandatory right of independent action. A conference agreement therefore is not required to provide for a right of independent action with respect to loyalty contracts and may prohibit the use of loyalty contracts by individual members. This conclusion is consistent with the intent of Congress and preserves the balance of carrier and shipper interests in the legislative scheme and the accommodation of those interests worked out by the Congress in the Shipping Act of 1984.
 
 
 18
 Id. at 31.
 
 
 19
 The Commission stated that its conclusion was "based on the determination that a loyalty contract is not a 'rate or service item' within the meaning of section [1704(b)(8) ] of the Act." Id. at 69.
 
 
 20
 The Commission reviewed at length the legislative history of the Act during its consideration by three successive Congresses. The Commission stated that "[o]ne theme that emerges from the legislative history of the 1984 Act is the effort on the part of Congress to balance conflicting interests of carriers and shippers.... Both carriers and shippers were actively engaged in the legislative process. Each obtained certain features that it sought." Id. at 66.
 
 
 21
 The Commission concluded that "[b]ased on an examination of the overall statutory scheme, it would appear that allowing independent action on loyalty contracts would upset the balance intended by Congress. By the mere expedient of changing the service commitment from a fixed quantity to a percentage, a member could offer its own loyalty contract and conferences would lose all control over the contract arrangements of their members." Id. at 68.
 
 
 22
 The Commission's ultimate conclusion was that "it is consistent with the objectives of the Act to determine that a loyalty contract is not a rate or service item and therefore is not subject to the mandatory right of independent action." Id. at 69.
 
 II
 
 23
 In Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Supreme Court instructed that "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." (A) "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." (B) "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted). The Court recently explained that the second inquiry is "whether the agency's construction is 'rational and consistent with the statute.' " Sullivan v. Everhart, --- U.S. ----, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (quoting NLRB v. United Food & Commercial Workers, 484 U.S. 112, 123, 108 S.Ct. 413, 420-21, 98 L.Ed.2d 429 (1987)).
 
 
 24
 This court has indicated that the Chevron principles apply to the Commission's interpretation of the 1984 Act. National Customs Brokers & Forwarders Ass'n of Am. v. United States, 883 F.2d 93, 97 (D.C.Cir.1989) (Under Chevron, "to the extent that the intent of Congress is not clear, we must accept an agency's reasonable interpretation of the substantive terms of a statute it is charged to administer.").
 
 
 25
 A. Section 1704(b)(8) requires that conference agreements must permit members to take "independent action on any rate or service item required to be filed in a tariff under section 1707(a)...." 46 U.S.C.App. Sec. 1704(b)(8). The latter section requires the filing of tariffs showing all "rates, charges, classification, rules, and practices" and provides that "[t]ariffs shall ... include sample copies of any loyalty contract...." 46 U.S.C.App. Sec. 1707(a)(1)(E). The statutory question is whether the requirement that the tariffs shall "include" "sample copies of any loyalty contract" is a requirement that loyalty contracts be filed "as a rate or service item in a tariff under section 1707(a)...."
 
 
 26
 The language, structure and legislative history of the Act do not answer, or even address, that question. The statute does not define "rate or service item" or indicate whether a loyalty contract is such an item. The mere fact that sample copies of loyalty contracts are required to be included in filed tariffs does not make them "rate or service item[s]." The legislative history does not directly address the application of the independent action provision to loyalty contracts.
 
 
 27
 The congressional ambiguity with respect to whether the independent action provision covers loyalty contracts sharply contrasts with the legislative treatment of the application of that provision to service contracts and time-volume rates. Since service contracts are required to be filed pursuant to section 1707(c), they are not "rate or service item[s] required to be filed in a tariff under section 1707(a)." Section 1703(a)(7) authorizes conference agreements to "prohibit the use of service contracts." The conference report stated that "[s]ection [1707(a) ] does not require that service contracts be filed in a tariff. Consequently, section [1704(b)(8) ] does not require conferences to permit their members a right of independent action on service contracts." H.R.CONF.REP. NO. 600, 98th Cong., 2d Sess. 29 (1984), reprinted in 1984 U.S.CODE CONG. & ADMIN.NEWS 167, 285. The Commission has held that "[b]ecause service contracts are not required to be filed under [section 1707(a) ], a conference need not provide for a right of independent action on service contracts." Modifications to Trans-Pacific Freight Conference of Japan Agreement, 23 Shipping Reg. (P & F) 1390, 1397 (emphasis in original) [hereinafter Trans-Pacific ].
 
 
 28
 The right of independent action, however, plainly covers time-volume rates, which are required to be filed under section 1707(a). The conference report so stated. H.R.CONF.REP. NO. 600, 98th Cong., 2d Sess. 29 (1984), reprinted in 1984 U.S.CODE CONG. & ADMIN.NEWS 283, 285: ("[C]onference agreements must permit independent action on time-volume rates in [section 1707(b) ], since time-volume rates must be filed under [section 1707(a) ]."). The Commission so ruled in Trans-Pacific, 23 Shipping Reg. (P & F) at 1397. Apparently, there is no dispute that time-volume rates, like other rates, are "rate or service item[s]."
 
 
 29
 Thus, Congress has not "directly spoken to" this issue, or "unambiguously expressed" its intent, see Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781, on whether the independent action provision covers loyalty contracts. Accordingly, our inquiry here is the second one that Chevron mandates: "Whether the agency's answer is based on a permissible construction of the statute," i.e., whether it is "rational and consistent with the statute." Sullivan, 110 S.Ct. at 964. We answer the latter inquiry affirmatively.
 
 
 30
 B. In providing in section 1704(b)(8) the right of conference members to take independent action, Congress did not there specify the activities that the right covered. Instead, it limited that right to "any rate or service item required to be filed in a tariff under section 1707(a)...."
 
 
 31
 Loyalty contracts are required to be filed under section 1707(a), since that section provides that tariffs filed thereunder shall "include sample copies of loyalty contracts." 46 U.S.C.App. Sec. 1707(a)(1)(E). The Commission, however, held that they are not "a rate or service item," so the independent action provision does not cover them.
 
 
 32
 We hold that that conclusion "is based upon a permissible construction of the statute," Chevron, and "is rational and consistent with the statute," Sullivan.
 
 
 33
 The Commission stated that "rate or service item" is "intended to refer to the ordinary items that are required to be filed in a tariff," i.e., "a numbered article or provision in a tariff." Report & Order, slip op. at 40. It stated that
 
 
 34
 the understanding of rate both in the context of shipping and in transportation and common carrier law more generally is that it is a particular charge levied for a particular service. Similarly, an item of "service" is a particular service provided by a carrier to a shipper. A "rate or service item" would thus appear to be the ordinary, discrete items which appear in a tariff.
 
 
 35
 Id. at 41 (emphasis in original).
 
 
 36
 This conclusion is supported by the statutory language. Unlike time-volume rates, which under section 1707(b) may be included among the rates shown in tariffs required to be filed under section 1707(a), the particular terms of loyalty contracts are not required to be filed under that section as a "tariff" "showing" a carrier's "rates, charges, classifications, rules, and practices." Instead, the tariffs are required to include only "sample copies" of loyalty contracts. If Congress had intended to treat a loyalty contract as a "rate or service item required to be filed in a tariff under section 1707(a)," it is unlikely that it would have handled the subject in this way.
 
 
 37
 As the Commission stated in summarizing its "examination of [the] statutory language,"
 
 
 38
 the Act differentiates between a "loyalty contract" and the term "rate or service item." A loyalty contract is defined by statute. It involves mutual commitments of both parties to the contract. A conference or carrier offers a rate lower than its regular published tariff rate and the shipper in turn obligates itself to commit all or a fixed portion of its cargo. A "rate or service item," on the other hand, while not defined by the Act, would appear to be the ordinary "items" stated in a tariff and not the extraordinary tying device of a loyalty contract.
 
 
 39
 Report & Order, slip op. at 46.
 
 
 40
 The Commission further supported its conclusion by noting that the machinery in section 1704(b)(8) by which other conference members may adopt the independent action taken by a member "does not function as well in the context of loyalty contracts as it does for ordinary tariff items applicable to individual shipments." Id. It pointed out that "[i]n the case of an ordinary tariffed rate or service item, the mechanism of adopting independent action operates in a reasonably straightforward manner. If a carrier member exercises independent action to offer a lower rate on a commodity, another carrier member may adopt that action on or after its effective date." Id. at 44. The Commission stated that "a loyalty contract by its very nature is intended to lock up future shipments as a result of the cargo commitment by a shipper," so that "[a]s a practical matter, ... the right of adopting independent action does not seem to be fully functional in the context of loyalty contracts." Id. at 44-45.
 
 
 41
 As noted, the Commission discussed at length the legislative history of the 1984 Act, which spanned three Congresses. It pointed out that nothing in that history
 
 
 42
 directly addresses the matter at issue here; i.e., whether a conference must allow its members to exercise independent action to offer a loyalty contract. A close examination of that history, however, does support the conclusion that Congress did not consider loyalty contracts to be the kind of ordinary tariff matter which would be subject to mandatory independent action. Thus that legislative history supports a determination that a loyalty contract is not a "rate or service item" within the meaning of section [1704(b)(8) ].
 
 
 43
 Id. at 47 (emphasis in original).
 
 
 44
 Not surprisingly, there is material in the extensive legislative history that may be viewed as suggesting the contrary conclusion. We cannot say, however, that the Commission distorted or drew impermissible inferences from the legislative history or unreasonably concluded, as it did, that "[t]he cumulative weight of the legislative history of the 1984 Act as it unfolds through three Congresses supports the conclusion that independent action was not intended to apply to loyalty contracts." Id. at 64.
 
 
 45
 The Commission's decision in this case is consistent with its prior decisions dealing with the independent action provision. We have discussed above the Commission's rulings that that provision applies to time-volume rates but not to service contracts. In In re Independent Action Provisions of Atl. & Gulf/W. Coast of S. Am. Conference Agreement, 23 Shipping Reg. (P & F) 390, 397 (F.M.C.1985), the Commission concluded that because "neither brokerage nor freight forwarder compensation, ... is a 'rate or service item' within the meaning of [section 1704(b)(8) ]," "[t]he Act, therefore, does not provide for a mandatory right of independent action with regard to freight forwarder compensation or freight brokerage."
 
 
 46
 Finally, the Commission permissibly concluded that "[t]he overall objective of the 1984 Act of balancing carrier and shipper interests through the independent action, service contract and other provisions is best preserved by an interpretation that independent action does not apply to loyalty contracts. Application of independent action to loyalty contracts would undermine the statutory scheme established by Congress when it authorized conferences to control the exercise of independent action on service contracts." Id. at 71. As the Commission explained:
 
 
 47
 To allow independent action on loyalty contracts would mean that conference members could shift their service offerings from service contracts to loyalty contracts and evade conference control.... By the mere expedient of changing the service commitment from a fixed quantity to a percentage, a member could offer its own loyalty contract and conferences would lose all control over the contract arrangements of their members. Nothing in the language or history of the 1984 Act supports the view that Congress deliberately eliminated independent action on service contracts and at the same time intended that independent action apply to loyalty contracts and thereby produce the same result.
 
 
 48
 Id. at 67-69.
 
 
 49
 The United States, which is a statutory respondent before this court, 28 U.S.C. Sec. 2344 (1982), urges reversal of the Commission's decision as contrary to the language and history of the Act. Our discussion above adequately answers those contentions. In addition, the United States, based upon "the basic dynamics of cartel pricing," argues that "permitting a right of independent action on loyalty contracts is consistent with the policy of the Act," and that "independent service contracts are much more likely to be a destabilizing influence in conferences than independent loyalty contracts...."
 
 
 50
 The determination of the probable effect upon the conference system of permitting independent action with respect to loyalty contracts, however, is one that lies primarily within the informed discretion of the Commission. The Commission is the expert agency to which Congress delegated the administration of the 1984 Act. The Commission's conclusion that permitting independent action for loyalty contracts would upset the delicate balance between the interests of carriers and shippers that the 1984 Act embodies is precisely the kind of expert judgment that Congress committed to the agency. It would be inappropriate for us, as a reviewing court, to reject the Commission's expert judgment on this matter and thereby substitute our opinion for that of the agency.
 
 
 51
 This conclusion of the Commission reflects a permissible and rational construction of the 1984 Act. We decline the invitation of the United States to reverse the Commission's decision based on the view of the United States that the Commission's evaluation of the effect upon the conference system of permitting independent action on loyalty contracts involved faulty economic analysis.CONCLUSIONE, 283 U.S.App.D.C. 334>>CONCLUSION
 
 
 52
 The order of the Federal Maritime Commission is
 
 
 53
 Affirmed.
 
 
 
 *
 The Honorable Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)