OREGON ASSOCIATION OF HOSPI-
TALS, an Oregon nonprofit corpora-
tion, on behalf of its participating
members; Portland Adventist Medical
Center; and St. Charles Medical Cen-
ter, Inc., dba St. Charles Medical Cen-
ter, Plaintiffs,

v.

Otis R. BOWEN, Secretary of the United
States Department of Health and Hu-
man Services; United States of Amer-
ica; Department of Health and Human
Services, an agency of the United States
of America, Defendants.

Civ. No. 88–625–FR.

United States District Court,
D. Oregon.

Feb. 17, 1989.

Graham M. Hicks, J. Barrett Marks, Harlan Edward Jones, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Jack G. Collins, Asst. U.S. Atty., Portland, Or., Thomas K. Stuber, Dept. of Health and Human Services, Baltimore, Md., for defendants.

## OPINION

FRYE, District Judge:

Plaintiffs in this action are the Oregon Association of Hospitals (OAH), a nonprofit corporation representing member hospitals in the State of Oregon, Portland Adventist Medical Center, Inc. (Portland Adventist), and St. Charles Medical Center (St. Charles).

Defendant, Otis R. Bowen, Secretary of the United States Department of Health and Human Services (HHS), heads the federal agency charged with the administration of the Medicare program established by Congress under the Social Security Act of 1966, 42 U.S.C. § 405(g) (the Act). HHS administers aspects of the Medicare program relevant to this case through the Health Care Financing Administration (HCFA). Portland Adventist and St. Charles have contracted with HHS to provide services to patients insured under the Medicare program and to accept payment for those services only as the law provides.

Between September 8, 1987 and December 11, 1987, Portland Adventist provided medical and rehabilitative services to a victim of an automobile accident who was insured under Medicare. Portland Adventist's total charges were $116,327.95. Portland Adventist filed a hospital lien in connection with those charges pursuant to the lien law of the State of Oregon, O.R.S. 87.555, against the patient's uninsured motorist insurance carrier and has not billed the Medicare intermediary, Blue Cross/Blue Shield of Oregon (Blue Cross). Portland Adventist has collected $35,000 in insurance proceeds on the patient's liability insurance policy.

Between June 10, 1986 and October 7, 1986, St. Charles provided medical and rehabilitative services to the victim of an automobile accident who was insured under Medicare. St. Charles' total charges were $164,268.09. St. Charles filed a hospital lien in connection with those charges pursuant to the lien law of the State of Oregon, O.R.S. 87.555, against the patient's liability insurance carrier. St. Charles has collected $66,667 in insurance proceeds on the patient's liability insurance policy. On October 20, 1986, St. Charles renewed its lien to include additional charges incurred for the patient's hospitalization. On August 3, 1987, St. Charles filed a notice of satisfaction of its hospital lien. The total amount recovered by St. Charles from the patient's liability insurance carrier is $86,334.

When HCFA became aware that St. Charles had filed the liens, it instructed St. Charles to refund to the patient the $50,000 difference between the Medicare payment and the $86,334 the hospital had collected from the patient's liability insurance carrier pursuant to the lien. In a letter dated November 2, 1987, the fiscal intermediary,[1] Blue Cross, cited section 3419 of the Medicare Intermediary Manual and stated that "a provider may not collect more than their [sic] DRG payment from a liability insurer." Memorandum in Support of Plaintiff's Application for Preliminary Injunc-

---

1. Under the Medicare system, claims for reimbursement filed by health care providers such as Portland Adventist are reviewed and paid through non-governmental agents of the Secretary of HHS called fiscal intermediaries. 42 U.S.C. § 1395h. The fiscal intermediaries have the responsibility to assure that proper payments and adjustments are made. 42 U.S.C. § 1395g(a). The intermediary involved in this case is Blue Cross.

tion, Exhibit 2, p. 1. At that time, section 3419 provided, in pertinent part:

> If the provider believes that a liability insurer may be willing to pay the provider's bill, it may bill the insurer instead of Medicare. The provider may collect up to its total charges from the liability insurer. If the insurer doesn't pay in full, the provider may bill Medicare for secondary benefits. However, once a provider has filed a claim with Medicare, it may no longer bill the liability insurer, except for deductible and coinsurance amounts and charges for noncovered services. If the provider has filed a claim with the insurer but later decides to bill Medicare instead, it must drop its claim with the insurer.

Medicare Intermediary Manual § 3419.

Responding to the fiscal intermediary's letter, St. Charles stated that "[w]e cannot find any place in the Hospital Manual where it 'specifically states a provider may not collect more than their [sic] DRG payment from a liability insurer.' ... The Hospital Manual does not give specific instructions on what to do when a liability insurer payment exceeds the medicare payment rate." Memorandum in Support of Plaintiff's Application for Preliminary Injunction, Exhibit 3, p. 1.

In reply, HCFA stated that:

> [a]lthough Medicare actually made no payment for services rendered to [the patient] because of the Medicare Secondary Payer provision of the law, she is still entitled to have Medicare payments made on her behalf. Therefore, by collecting more from her than Medicare would have paid, your facility is in violation of its agreement with the Secretary.

Memorandum in Support of Plaintiffs' Application for Preliminary Injunction, Exhibit 4, p. 1.

HCFA cited section 1866 of the Social Security Act (42 U.S.C. § 1395cc), which states:

> (a)(1) Any provider of services ... shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—
>
> (A) not to charge, except as provided in paragraph (2), any individual or any other person for items or services for which such individual is entitled to have payment made under this sub-chapter.

42 U.S.C. § 1395cc(a)(1)(A).

St. Charles responded on January 6, 1988, stating that 1) the Social Security Act does not prohibit St. Charles from charging a liability insurer an amount above the patient's DRG amount because when a liability insurer makes payment to St. Charles and St. Charles does not bill Medicare, the patient is not "entitled" to have the Medicare payment made; and 2) payment to St. Charles of more than the DRG amount is not unfair to the patient because the patient's insurance settlement is based on the actual charges owing, not on the DRG amount.

In March, 1988, HCFA published an advance copy of new provisions for incorporation at section 3419.3 of the Medicare Intermediary Manual. The new provisions are, in pertinent part, as follows:

> C. *Medicare Must Be Billed.*—Although services are needed because of an accident or a diagnosis/trauma code is shown, a physician, supplier, or provider must bill Medicare for conditional primary payments even if it believes that there is a reasonable likelihood that a liability insurer will pay promptly....
>
> D. *Prohibition Against Billing Liability Insurer.*—Providers of services may not bill liability insurers instead of Medicare. The criteria for extension of the time limit for filing claims do not apply, if the late filing of a Medicare claim is due to the provider's not following instructions by billing liability insurance instead of Medicare.
>
> E. *Prohibition Against Billing Beneficiary.*—A ... provider may not bill a beneficiary for covered services even though the beneficiary has received payment from a liability insurer for the injury or illness for which the services were furnished. This rule applies whether or not the provider has claimed or accepted conditional primary Medicare benefits. *Since these are covered services,* the

beneficiary is protected by the assignment or provider agreement, i.e., a provider of services may not bill a beneficiary for such services, except for deductible and coinsurance amounts.

F. *Prohibition Against Filing a Lien Against Liability Settlements.*— Providers of services may not file a lien against a beneficiary's liability insurance proceeds. To do so is tantamount to billing the beneficiary and is a violation of the assignment or provider agreement.

Complaint, Exhibit A, p. 2.

On June 7, 1988, HCFA notified St. Charles of the termination of its Medicare provider agreement effective July 11, 1988.

## SUMMARY OF ARGUMENTS

Plaintiffs argue that the HCFA regulations published in the Medicare Intermediary Manual, section 3419.3, requiring providers to bill Medicare rather than a liability insurer and prohibiting filing a lien against liability settlements are void on two grounds: 1) inconsistency with the governing (MSP) statute, and 2) lack of required notice and comment. Plaintiffs contend that notice and comment are required pursuant to the Administrative Procedure Act, the Freedom of Information Act, and the Social Security Act because the new regulations affect the substantive rights of hospitals to file liens and to recover their full charges from the insurers of Medicare patients. Plaintiffs argue that under the Medicare Act, a Medicare patient is not "entitled" to have payment made by Medicare when payment can reasonably be expected to be made by an insurer. Plaintiffs argue that when a hospital seeks payment from an insurer, it is not taking money from the patient, and that the new HCFA rules are not consistent with the purpose of the statute to lower government costs.

In response, defendants assert that because the change in the manual is interpre-

tive, not substantive, it does not require notice-and-comment rulemaking. Furthermore, defendants argue that the changes are consistent with the Medicare Act's purpose to protect its elderly beneficiaries from the high cost of health care. Defendants argue that when a hospital files a lien pursuant to O.R.S. 87.555 against a patient's liability insurance award, it is in effect billing the patient in violation of 42 U.S.C. § 1395cc.

## APPLICABLE STANDARD

Although considerable deference is due to the construction placed upon a statute by the agency charged with implementing its provisions, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), it is the courts, and not the administrative agencies, who are the final authority in matters of statutory construction. *Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). In another case involving the statutory construction of section 1862(b)(1) of the Social Security Act, 42 U.S.C. § 1395y(b)(1) (the Medicare Secondary Payer Program), the court held that "[u]nder these circumstances, the Court's review is limited to determining whether the Secretary's regulation was promulgated in excess of her authority and whether it is arbitrary and capricious." *Abrams v. Heckler,* 582 F.Supp. 1155, 1163 (S.D.N.Y.1984) (citing *Heckler v. Campbell,* 461 U.S. 458, 466, 103 S.Ct. 1952, 1956, 76 L.Ed.2d 66 (1983).

## DISCUSSION

*Standing*

Plaintiffs assert that the court has jurisdiction pursuant to 42 U.S.C. § 405(g). Defendants state that in the interest of expediting judicial review of the legal issue involved, they waive the exhaustion of administrative remedies requirement of 42 U.S.C. § 405(g)[2] with respect to St.

---

**2.** The Medicare Act provides for judicial review of determinations regarding provider agreements at 42 U.S.C. § 1395cc(h): "[A]n institution or agency dissatisfied with ... a determination described in subsection (b)(2) of this sec-

tion [termination of provider agreements] shall be entitled to ... judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

Charles, but assert that neither Portland Adventist nor the OAH have met the required jurisdictional requirement under section 405(g) of "presenting" a concrete claim.

HHS acknowledges that St. Charles has a justiciable claim because the Secretary of the Department of HHS has issued a letter terminating St. Charles' provider agreement. But defendants assert that the presence of OAH and Portland Adventist constitutes nothing more than a request for an advisory opinion.

■ The United States Supreme Court has held that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986) (citing *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 334, 97 S.Ct. 2434, 2437, 53 L.Ed.2d 383 (1977), the court sets out the three-part test as follows:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

The court finds that OAH has standing to pursue this action.

■ Portland Adventist asserts that it has been wrongfully instructed by HCFA to relinquish a lien and is presently prevented from collecting money to which it is entitled. Assuming that this is true, Portland Adventist makes no claim that it has exhausted its administrative remedies pursuant to section 405(g). Since defendants have not waived the exhaustion requirement with respect to Portland Adventist as it has with regard to St. Charles, the court finds that it has no jurisdiction over the claim of Portland Adventist.

42 U.S.C. § 405(g) states in part: "Any individual, after any final decision of the Secretary made after a hearing to which he was a party,

*The Statutory Scheme*

During the first fifteen years of the Medicare program, Medicare was primary payer for all services to Medicare beneficiaries, with the sole exception of services covered under workers' compensation. It was not until 1980 that Congress began to amend section 1862 of the Act to make Medicare the secondary payer in some situations. For example, Congress made Medicare secondary to liability insurance, presumably in order to lower government costs. 53 Fed.Reg. 115, 22335 (June 15, 1988).

The 1980 amendment became known as the Medicare Secondary Payer (MSP) program, 42 U.S.C. § 1395y. As originally enacted, it stated in pertinent part:

*Payment under this subchapter may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made* (as determined in accordance with regulations), *with respect to such item or service, under ... [a] liability insurance policy or plan....* Any payment under this subchapter with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received that payment for such item or service has been made under such a law, policy, plan, or insurance.

42 U.S.C. § 1395y(b)(1) (1980) (emphasis added).

In 1984, Congress passed the Deficit Reduction Act (DEFRA) (Pub.L. 98–369). Section 2344 of this Act amended section 1395y(b)(1) of the MSP program by adding the words "promptly" and "or could be" so that the section now provides:

*Payment under this subchapter may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made promptly* (as determined

irrespective of the amount in controversy, may obtain a review of such decision by a civil action."

in accordance with regulations), *with respect to such item or service, under ... [a] liability insurance policy or plan....* Any payment under this subchapter with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received that payment for such item or service has been or could be made under such a law, policy, plan, or insurance.

42 U.S.C. § 1395y(b)(1) (1984) (emphasis added). Congress did not offer a detailed explanation of its changes, but merely stated that the changes made explicit Medicare's right of subrogation to primary payers. Memorandum in Support of Defendants' Motion to Dismiss, Exhibit C, p. 4, quoting Conference Report 98–861 [To accompany H.R. 4170], Deficit Reduction Act of 1984 at 1329–30.

In 1980, when Congress passed the MSP statute, the amount a provider collected from Medicare, as primary payer, was essentially the same as the amount it collected from a third party primary payer. At that time, the Medicare Act required the Secretary to pay hospitals based on their "reasonable cost" for providing the services. 42 U.S.C. § 1395f(b). The Medicare Intermediary Manual provided at that time, and until 1988, that:

> [i]f the provider believes that a liability insurer may be willing to pay the provider's bill, it may bill the insurer instead of Medicare. The provider may collect *up to its total charges* from the liability insurer. If the insurer doesn't pay in full, the provider may bill Medicare for secondary benefits.

Medicare Intermediary Manual § 3419 (emphasis added).

For cost periods beginning after October 1, 1983, such as the ones at issue in this case, 42 U.S.C. § 1395ww, enacted by Pub. L. 98–21, provides for payment based upon prospectively determined rates. Under this system, the actual operating costs of hospitals have no bearing upon the amounts paid. Using formulae published in the *Federal Register*, a provider can determine for itself precisely what payment it will receive for treating a Medicare patient for a given diagnosis.

In enacting the prospective payment system, Congress did not express its intent with respect to whether or not third party primary payers under the MSP program must be charged the DRG amount or whether providers may continue to collect their total charges from third party primary payers. The total charges are often, as in this case, substantially greater than the DRG amount.

In the absence of a congressional statement of intent with respect to the issue, the court looks to the plain meaning of the language of the statute.

The statute contains a clear prohibition: "Payment ... may not be made ... to the extent that payment ... can reasonably be expected to be made promptly ... under ... [a] liability insurance policy." The statute authorizes conditional payments under two circumstances: 1) the payment under a liability insurance policy cannot reasonably be expected to be made promptly, and, in the second sentence, 2) notice or other information has not been received that payment for such item or service has been or could be made under a liability insurance policy.

In this case, St. Charles was advised early in the patient's treatment that liability insurance was available. The insurance company negotiated promptly with the patient's attorney who informed the insurance company of the hospital's actual charges (not the DRG amounts) while the patient was still hospitalized. A hospital lien was then filed by the hospital against the liability insurer for the actual charges of the hospital (not the DRG amounts).

Plaintiffs assert that the effect of the statute's prohibition on Medicare payment is to remove the patient from "entitlement" to Medicare in this specific circumstance, and therefore to remove St. Charles from the constraints of the provider agreement.

Under its provider agreement, St. Charles agreed to charge only as the law permits. Section 1866 of the Social Security Act (42 U.S.C. § 1395cc) states:

(a)(1) Any provider of services ... shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement—

(A) not to charge, except as provided in paragraph (a), any individual or any other person for items or services for which such individual is *entitled* to have payment made under this subchapter. (Emphasis added).

The issue is whether, under the facts of this case, the patient was entitled to have payment made by Medicare. The plain meaning of the MSP statute is to remove patients for whom a primary payer other than Medicare is available from entitlement to Medicare payments (with the two exceptions noted above, neither of which apply in this case). Support for this view may be found in a closer analysis of the term "entitled."

The general requirements of "entitlement" to Medicare benefits are stated in the Medicare Act at 42 U.S.C. § 1395c and, by reference, in the Social Security Act at 42 U.S.C. § 426:

The insurance program for which *entitlement* is established by section 426 and 426–1 of this title provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care in accordance with this part for (1) individuals who are age 65 or over and are eligible for retirement benefits under subchapter II of the chapter ... (2) individuals under age 65 who have been entitled for not less than 24 months to benefits under subchapter II of this chapter ... and (3) certain individuals who did not meet the conditions specified in either clause (1) or (2) but who are medically determined to have end stage renal disease.

42 U.S.C. § 1395c (emphasis added).

Section 426 sets out broad categories and conditions of entitlement to Medicare. Individuals over age 65 who are entitled to monthly old age and survivors' insurance benefit payments, qualified railroad retirement beneficiaries, and others are "entitled" to Medicare coverage.

There is no dispute here but that the patient is a Medicare eligible person. The issue is whether, as a Medicare eligible person, she is entitled to have payment made by Medicare when there is liability insurance coverage available to pay for the services rendered by St. Charles.

The word "entitled" as used with reference to provider agreements is followed by the words "to have payment made." If Congress had intended to use the word "entitled" as defendants argue, it could have followed it with the more general term "to cover" or even "to protect." Instead, Congress followed the word "entitled" with the specific phrase "to have payment made." Therefore, the provider agreement does not apply to a Medicare "beneficiary" who is not "entitled to have payment made." The MSP statute prohibits Medicare from paying when a liability insurer is available to pay promptly. There is a reason for this—to lower government costs. Since the provider agreement does not apply in this situation, HCFA has no authority under the statute to prevent St. Charles from recovering its actual charges from a liability insurer who is available to pay promptly. It follows that any rules promulgated by HCFA which have the effect of limiting St. Charles' recovery in this case are void.

Defendant cites two cases holding that a hospital may not collect more from a Medicare beneficiary's liability settlement than Medicare will pay as a primary payer. In *Holle v. Moline Pub. Hosp.*, 598 F.Supp. 1017 (C.D.Ill.1984), Medicare paid a hospital $19,380.77 in Medicare benefits for a patient whose total hospital charges were substantially more than that amount and who received a liability settlement related to the hospitalization. The hospital filed a lien against the liability settlement, and the court declared the lien void. *Id.* at 1021. In *Rybicki v. Hartley*, 792 F.2d 260 (1st Cir.1986), Medicare paid a hospital roughly $9,000 in Medicare benefits for a patient whose total hospital charges were $31,000. The hospital sought the difference from the patient's liability settlement, but both the district and circuit courts found for the patient.

The two cases are distinguishable from the instant case because in both *Holle* and *Rybicki*, the hospitals had billed Medicare and had received payment. Thus, the argument that the patients were not entitled to benefits was foreclosed to them, and HCFA retained authority over the hospitals because of their provider agreements. The *Holle* court said that "[u]nder its agreement with Medicare, the Hospital may not file a lien for amounts that represent charges for covered services *for which Medicare has been billed by the provider*, except for deductible or co-insurance amounts." *Holle*, 598 F.Supp. at 1021 (emphasis added). And, in dictum, the *Rybicki* court agreed with the contention that had the liability insurer settled the patient's claim immediately, no Medicare payment would have been made and the hospital would have been free to charge its full fee. *Rybicki*, 792 F.2d at 263. Therefore, both cases support the position that where Medicare has never been billed, as in the instant case, the provider agreement does not apply, and HCFA has no authority to impose limitations on the hospital's recoveries.

Because the court finds that defendants have exceeded their authority under the MSP statute by promulgating the new regulations, it need not address the notice and comment issue.

## CONCLUSION

Defendants' motion to dismiss (#) is granted as to Portland Adventist and denied as to OAH and St. Charles.

█ To the extent that Medicare Intermediary Manual § 3419.3, promulgated in March, 1988, limits the substantive rights of Medicare-participant providers to recover more from liability insurers than from Medicare, when the liability insurer is a primary payer who will pay promptly and the MSP statute precludes Medicare payment, the court finds section 3419.3 void. OAH and St. Charles are entitled to judgment on the merits.