The plaintiffs, Frank D. Joiner and his wife, Avis C. Joiner, appeal from a summary judgment for the defendant, Medical Center East, Inc., in this action seeking equitable relief and damages based on allegations of negligence, wantonness, breach of contract, fraudulent suppression, and slander of title, arising out of a hospital lien filed by Medical Center East against the proceeds of a liability insurance settlement. We hold that the lien filed by Medical Center East against the settlement proceeds was valid and enforceable because Medical Center East had the right under applicable federal law to obtain full payment of its charges from those proceeds; therefore, because each of the plaintiffs' claims presupposes the invalidity of the lien, we affirm the summary judgment.
The pertinent facts are undisputed: The Joiners were injured in an automobile accident on May 31, 1994. The driver of the other automobile involved in the accident had liability insurance coverage. Frank Joiner was admitted to Medical Center East for treatment on the day of the accident; he was discharged on June 4, 1994. Medical Center East is an approved Medicare health services provider and Frank Joiner was, at the time of his admission and treatment, Medicare eligible. Although Frank Joiner was eligible *Page 1210 
to have his $14,778.76 hospital bill paid by Medicare, Medical Center East elected to forgo billing Medicare and, instead, filed a lien on June 29, 1994, pursuant to Ala. Code 1975, §35-11-370 et seq., against the proceeds of any settlement that Joiner might enter into with the liability insurer of the driver of the other automobile. The amount that Medical Center East sought to recover by virtue of its lien ($14,778.76) was in excess of the amount it had agreed to accept as payment from Medicare under its provider agreement. On or about February 28, 1995, 269 days after he had been discharged from the hospital, Frank Joiner settled with the other driver's liability insurer for $50,000. Joiner requested that Medical Center East withdraw its lien and that it accept payment in full from Medicare. Medical Center East refused this request. The Joiners then filed this action and later paid into the court the liability insurance proceeds that were the subject of the lien.
The trial court stated in its judgment that it considered the dispositive issue to be whether Medical Center East had a valid lien against $14,778.76 of the proceeds recovered by Frank Joiner pursuant to his settlement with the other driver's liability insurer. Without addressing any of the other arguments made by Medical Center East in support of the summary judgment motion, the trial court, concluding that Medical Center East had a legal right to receive payment in full from the proceeds of Frank Joiner's settlement, held the lien to be valid. Thus, the trial court entered a summary judgment for Medical Center East and ordered disbursement of the $14,778.76 that had been paid into the court. The Joiners appealed.[1]
Our decision in this case hinges upon our resolution of a pure question of law — whether Medical Center East had the right under federal law to obtain full payment for Frank Joiner's medical treatment from the proceeds of his settlement with the liability insurer. If Medical Center East had that right, then the lien that it filed against the proceeds of Joiner's liability insurance settlement was valid and the summary judgment was proper. See Rule 56, Ala.R.Civ.P. If, on the other hand, Medical Center East did not have the right to obtain full payment for Frank Joiner's medical treatment from the proceeds of his settlement, then the lien was not valid and the summary judgment is due to be reversed.
In support of its judgment, Medical Center East contends, and the trial court held, that Congress has made Medicare a secondary payer when proceeds covering a beneficiary's medical bill are due from a third-party tortfeasor's liability insurer. Relying primarily on Oregon Ass'n of Hospitals v. Bowen,708 F. Supp. 1135 (D.Or. 1989), and American Hospital Ass'n v.Sullivan (D.D.C., May 24, 1990, No. Civ.88-2027) (not reported in F. Supp.), 1990 WL 274639, Medical Center East argues that a Medicare-approved health services provider has the right under federal law to elect to file a lien under state law against liability insurance proceeds owing to the beneficiary for medical services provided to the beneficiary. According to Medical Center East, Congress changed Medicare from a primary payer to a secondary payer when liability insurance is available, in an attempt to shift financial responsibility for a beneficiary's medical treatment from Medicare to the party responsible for the beneficiary's injuries. This change in the law, according to Medical Center East, was intended to reduce Medicare's costs.
The Joiners concede that Congress changed the law so as to make Medicare a secondary payer. They argue, however, that that change provided only for Medicare to become a secondary payer under certain limited circumstances. Relying, in part, on what they characterize as the clear language of42 U.S.C. § 1395y(b)(2)(A) and 42 C.F.R. § 411.50(b), as well as on Bowen
and Sullivan, *Page 1211 
supra, the Joiners argue that Medical Center East lost its statutory authorization to obtain payment from Mr. Joiner's settlement because, the Joiners argue, that settlement was not made "promptly" (i.e., within 120 days of Frank Joiner's discharge from the hospital), as a matter of federal law. After carefully examining the record and after considering the arguments of the parties, we conclude that Medical Center East has correctly interpreted federal law.
In Sullivan, supra, one of the two cases primarily relied on by both sides here, the United States District Court for the District of Columbia was concerned with the validity of a regulation promulgated by the Secretary of the United States Department of Health and Human Services, the federal agency charged with administering the Medicare program established by Congress, and the administrator of the Health Care Financing Administration, which administers aspects of the Medicare program relevant to this case. The question presented inSullivan was whether that regulation, which prohibited health-care providers from accepting payment from a liability insurer for a beneficiary's medical treatment, conflicted with congressional intent. The Sullivan court struck down the regulation. Because we find that case to be both informative and instructive, we quote from it extensively:
 "The Medicare program was established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., which provided for a program of Health Insurance for the Aged and Disabled. Providers receive payment for services provided to beneficiaries on a 'reasonable cost' basis. 42 U.S.C. § 1395f(b). In order to secure reimbursement for these services, providers must enter into a 'provider agreement' with the Secretary of HHS [Health and Human Services], in which they agree to follow various regulations concerning the provision and administration of Medicare benefits. 42 U.S.C. § 1395cc(a).
 "In 1980, as part of an overall cost-cutting measure, Congress amended 42 U.S.C. § 1395y(b)(1) to require that the Secretary not make payment 'with respect to any item or service to the extent payment has been made, or can reasonably be expected to be made (as determined in accordance with regulations) . . . under an automobile or liability insurance policy or plan. . . .' Omnibus Budget Reconciliation Act of 1980, § 953 (Pub.L.96-499) (hereinafter 'the Secondary Payer Provision').[1] The original regulations promulgated under the Secondary Payer provision followed the statutory language almost exactly and required that providers first look to insurance companies for payment when a beneficiary is covered. See
42 C.F.R. § 402.322(c) (1988). Defendants' contention at that time was that Medicare coverage did not exist for beneficiaries who have insurance to cover such services. See 'Medicare Program; Services Covered Under Automobile, Liability, and Employer Group Health Insurance,' Proposed Rule, 47 Fed.Reg. 21,103, 21,104 (May 17, 1982) ('by virtue of the existence of the [liability] insurance policy or no-fault law, Medicare coverage would not exist'); see also Final Rule, 48 Fed.Reg. 14,802 (Apr. 5, 1983). The amended statute and regulations did allow for a 'conditional' payment to a provider for services for which a liability insurer is also liable. 42 U.S.C. § 1395y(b)(1); 42 C.F.R. § 405.324(a). Once a provider looks to Medicare for payment for services rendered, however, it must relinquish all claims to the insurance recovery, except coinsurance and deductibles. There is evidence that this policy was followed in some regions until as late as May 1987.[2]
 "Two separate changes, acting together, gave rise to this litigation. First, while providers have been allowed to bill their full charges to a liability insurer, see Medicare Intermediary Manual ('MIM') § 3419.3 (October 1985), since October 1, 1983, Medicare reimbursement has been limited to predetermined fixed rates, governed by the Prospective Payment System ('PPS'), which are not directly related to actual cost and are often lower than their charge would be for non-Medicare customers. 42 U.S.C. § 1395ww(d). Providers therefore have a new incentive to pursue private insurance reimbursement instead of Medicare. *Page 1212 
 "The second change, which is challenged here, took place sometime late in 1986 or early 1987, when the Secretary reevaluated the policy represented by the secondary payer provision. Plaintiffs allege that the Secretary was acting in reliance on advice from the HHS Office of General Counsel when he determined that providers should be prohibited from billing liability insurers. Instead, providers were required to bill Medicare, and accept Medicare fixed rate reimbursement as payment in full. HHS's new policy was first expressed in bulletins and letters to individual providers and regional directors. See, e.g., Regional Intermediary Letter No. 86-38, Clarification of Medicare Secondary Provision Regarding Liability Insurance, from Robert A. Streimer, Director, Bureau of Eligibility, Reimbursement and Coverage, to Regional Administrator, Region VI, June 12, 1987, Administrative Record, Vol. I.
 "In March 1988, the MIM was revised to reflect this same policy change. See MIM §§ 3419.3(C)-(F) (March 1988). The new MIM provisions were found to be contrary to the statutory language in an earlier suit in Oregon. See Oregon Association of Hospitals v. Bowen, 708 F. Supp. 1135 (D.Or. 1989). Defendants dismissed their appeal there after promulgating a Final Rule pursuant to Notice and Comment procedures. That Final Rule amended the regulations implementing the Secondary Payer Provision and barred providers from billing either a liability insurance carrier, placing a lien on the beneficiary's potential recovery, or billing the beneficiary directly.[3] See 'Medicare as Secondary Payer and Medicare Recovery Against Third Parties,' Final Rule, 54 Fed.Reg. 41,716 (October 11, 1989). This court granted plaintiffs a preliminary injunction on November 9, 1989, prohibiting enforcement of the Final Rule against plaintiffs pending resolution of this case.
". . . .
 "The merits of this case focus on the meaning of one provision of the Medicare as Secondary Payer policy and its potential conflict with the Medicare provider agreement regulations. Prior to the enactment of the secondary payer provision in 1980, Medicare was the primary payer for hospital and medical services received by its beneficiaries. Section 1395(b)(1) of the Medicare Act was amended in 1980 to require care providers to ascertain whether a Medicare beneficiary is covered by some other insurance and to bill that insurer first, only turning to Medicare if the insurance is not forthcoming. The original provision stated:
 " 'Payment under this subchapter may not be made
with respect to any item or service to the extent
that payment has been made, or can reasonably be expected to be made (as determined in accordance with regulations), with respect to such item or service, under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance. Any payment under this subchapter with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund. . . . In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any entity. . . . The United States shall be subrogated. . . . The Secretary may waive the provisions of this subsection in the case of an individual claim if he determines that the probability of recovery or amount involved in such claim does not warrant the pursuing of the claim.'
 "Omnibus Budget Reconciliation Act of 1980, § 953 (Pub.L.96-499) codified at 42 U.S.C. § 1395y(b)(1). In 1984, the statute was amended to substitute, 'to be made promptly' for 'to be made' in the first sentence of (b)(1). Pub.L. 98-369, § 2344(a)(1). The original regulations adopted under this statutory provision closely follow the language:
 " 'Exclusion from Medicare Payment. (1) Medicare payment may not be made for any services to the extent that payment has been made or can reasonably be expected to be made under automobile medical or no-fault insurance or under *Page 1213 
any liability insurance policy or plan (including a self-insured plan).'
 "42 C.F.R. § 402.322(c) (1988). These regulations remained unchanged until defendants' 1988 promulgation of the regulations at issue here. Defendants' Medicare Intermediary Manual also followed this same scheme:
 " 'If the provider believes that a liability insurer may be willing to pay the provider's bill, it may bill the insurer instead of Medicare. The provider may collect up to its total charges from the liability insurer. If the insurer doesn't pay in full, the provider may bill Medicare for secondary benefits. However, once a provider has filed a claim with Medicare, it may no longer bill the liability insurer, except for deductible and coinsurance amounts and charges for noncovered services. If the provider has filed a claim with the insurer but later decides to bill Medicare instead, it must drop its claim with the insurer.'
 "MIM § 3419.3 (1985). This MIM provision also remained unchanged until 1988.
 "In 1988, defendants promulgated a new MIM provision that governed secondary payer provision. The revised MIM provision was substantially different from the previous provision, and stated:
 " 'C. Medicare Must Be Billed. Although services are needed because of an accident . . . or a diagnosis/trauma code . . ., a provider must bill Medicare for conditional primary payments even if it believes that there is a reasonable likelihood that a liability insurer will pay promptly.
However, before a provider bills Medicare for primary benefits, it must first attempt to determine whether there are potential primary payers other than a liability insurer, e.g., an automobile no fault insurer or an employer group health plan. Such payers must be billed before Medicare.
 " 'D. Prohibition Against Billing Liability Insurer. Providers may not bill liability insurers instead of Medicare. . . .
 " 'E. Prohibition Against Billing Beneficiary. A provider may not bill a beneficiary for covered services even though the beneficiary has received payment from a liability insurer for the injury or illness for which the services were furnished. This rule applies whether or not the provider has claimed or accepted conditional primary Medicare benefits. Since these are covered services, the beneficiary is protected by the provider agreement, i.e., a provider of services may not bill a beneficiary for such services, except deductible and coinsurance amounts.
 " 'F. Prohibition Against Filing a Lien Against Liability Settlements. Providers may not file a lien against a beneficiary's liability insurance proceeds. To do so is tantamount to billing the beneficiary and is a violation of the provider agreement.'
"MIM § 3419.3 (March 1988).
 "In 1988 defendants undertook to revise the secondary payer regulations, and on October 11, 1989, defendants promulgated their Final Rule which became effective on November 13, 1989. The secondary payer regulations now state:
 " '[T]he provider or supplier — (i) May not bill the liability insurer nor place a lien against the beneficiary's liability insurance settlement for Medicare covered services. (ii) May only bill Medicare for Medicare-covered services. . . .'
 "Final Rule, 54 Fed.Reg. at 41,743 (to be codified at 42 C.F.R. § 411.54(c)(2)) (Oct. 11, 1989).
 "Defendants argue that the turn-around in their regulations came from an attempt to harmonize the secondary payer provisions with a second statutory provision which sets out the requirements for a provider agreement between the provider and the Secretary. That provision states:
 " 'Any provider of services . . . shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement —
 " '(A) not to charge, except [any deduction or coinsurance amounts] any individual *Page 1214 
or any other person for items or services for which such individual is entitled to have payment made under this subchapter . . .'
 "42 U.S.C.A. 1395cc(a)(1) (West 1989 Supp.). Previously, defendants had interpreted this requirement to bar only direct billing of a beneficiary or placing a lien on an insurance recovery, thus allowing the direct billing of an insurance company. Defendants now argue that this provision prohibits the billing of even an insurance company because it is the billing of 'any other person for items or services for which [the beneficiary] is entitled to have payment made. . . .' Defendants' position is that the new regulations are a legitimate and rational attempt to write regulations that do not conflict with either provision.
". . . .
 "In determining whether the regulations comport with the language of the statute, the court must give due deference to an agency's interpretation of its controlling statute. '[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute, that is, whether the agency's construction is "rational and consistent with the statute." ' Sullivan v. Everhart, et al., [110 S.Ct. 960, 494 U.S. 83, 108 L.Ed.2d 72
(1990)]. However, if the regulations 'cannot be reconciled with the statute they purport to implement' then the promulgating agency has exceeded its statutory authority. Sullivan v. Zebley, et al., [110 S.Ct. 885, 493 U.S. 521, 107 L.Ed.2d 967 (1990)].
 "As the Supreme Court has recently stated, the first task of courts reviewing challenges to an agency's interpretation of its governing statute is to first 'ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." ' Everhart, [110 S.Ct. at 964, 494 U.S. at 89, quoting] Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694
(1984).
". . . .
 "The statute in the instant case is remarkably clear on the policy at issue here. 'Payment under this subchapter may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) . . . under an automobile or liability insurance policy or plan.
The statute does not give the agency a choice — it must not pay if there is a liability insurer unless a determination has been made that the payment cannot be expected promptly. The original regulations seemed to acknowledge the detail of the regulations because they added nothing to the substance of this provision in implementing it. See
42 C.F.R. § 402.322(c) (1988). The statute requires
that Medicare withhold payment until a provider has first looked to a primary liability insurer. Now defendants have destroyed the congressional scheme by prohibiting providers from looking to a liability insurer, and requiring Medicare to pay these types of claims which might be paid from a non-governmental source.
 "Defendants argue that the new regulation is a harmonization of the potentially conflicting requirements of the secondary payer provision and the provisions governing the provider agreement. To be eligible to be reimbursed for services provided to beneficiaries, providers must agree not to charge 'any individual or other person for items or services for which such individual is entitled to have payment made under this subchapter' except for deduction or coinsurance amounts imposed by certain statutes. 42 U.S.C. § 1395cc
(a)(1)(A). Defendants argue that if are allowed to bill beneficiaries' liability insurers, it will directly reduce the amount of the beneficiaries' recovery, and thus is tantamount to billing the individual directly. Therefore for the purposes of this provision, a liability insurer is an 'other person' who may not be charged for services for which an individual is entitled to have payment. *Page 1215 
Defendants do not adequately address why a liability insurer should be considered an 'other person' for purposes of this section, while all the other outside sources listed in § 1395Y (workers' compensation law or plan or no fault insurance) should not. Defendants' distinction between the two types of insurers is that a non-liability insurer has a contractual obligation to provide benefits to the beneficiary, while the only connection between a provider and a liability insurer is the beneficiary herself. The court is not persuaded that this distinction is meaningful in the context of the provider agreement regulation.
 "The provider agreement provision presents a potential for conflict only if Medicare beneficiaries are 'entitled to payment' when they are covered by non-Medicare insurance (providers must not bill a beneficiary for services for which the beneficiary is entitled to have . . . payment made by Medicare). Defendants claim that the secondary payer provision is only a payment scheme and not an entitlement scheme, or else they would not be able to make conditional payments when an insurers' [sic] payment is not forthcoming. However, 'entitlement to payment' does not have to [be] read so broadly. A person's entitlement to benefits can be limited to certain circumstances. Congress is free to limit the types of services covered; it is also free to require procedural conformity for both beneficiaries and providers. When a beneficiary or provider does not follow the rules, they do not receive payment because they are not 'entitled.' Congress, in an attempt to cut fiscal waste and balance the budget, determined that when a person was eligible for Medicare but there was non-Medicare insurance, it was cheaper to require the provider to first attempt to recover from that insurer, possibly alleviating the need for any Medicare payment. Under the secondary payer provision, a Medicare recipient covered by non-Medicare insurance is only entitled to benefits, i.e., the hospital is only allowed to bill Medicare for conditional payments, after the claim had been presented to the private insurer or the Secretary determines that payments are not likely to be made promptly.
 "Defendants have also suggested that the regulation is the result of the Secretary's determination that liability insurers, as a rule, pay less promptly, and so, under the terms of the regulations, has decided to not require presentment of a claim to a liability insurer. The fundamental problem with this argument is that the Secretary did not waive the presentment requirement[;] he disallowed presentment even when the hospital thinks payment would be swift. Additionally, the last sentence of § 1395y(b)(1) states that '[t]he Secretary may waive the provisions of this subsection in the case of an individual claim if he determines that the probability of recovery or amount involved in such claim does not warrant the pursuing of the claim.' This sentence is a clear rebuttal to the idea that the Secretary could make changes in the presentment requirement of a class of insurers because it provides for only waiver of individual claims.
 "Finally, defendants have argued that Congress, in late 1989, 'ratified' the new regulations through its reconsideration of the statute and its failure to clarify its intentions as to whether liability insurers can be billed before Medicare or if the Secretary may order that liability insurers cannot be billed. See Omnibus Budget Reconciliation Act of 1989, H.R. 3299, 101st Cong. 1st Sess., 135 Cong. Rec. H9372 (daily ed. Nov. 21, 1989). However, that inference is specifically rebutted by language from the Congressional Record, and by comparing the proposals before Congress with the language adopted. The Senate Committee on Finance noted that
 " 'Due to pending litigation, the committee has taken no position on whether hospitals can seek imposition of liens against liability rewards in excess of Medicare payments. The Committee is aware that there are two lawsuits addressing the lien issue that have not yet been resolved (citing the instant case and the Oregon case). Thus, the Committee believes that it is premature and *Page 1216 
inappropriate for the Congress to enact legislation before judicial review is complete.
 "Senate Committee on Finance, OBRA 1989, 101st Cong., 1st Sess., 135 Cong. Rec. 13,113, 13,226-27 (October 12, 1989). This is not a statement of a Committee 'ratifying' an agency action, but rather the statement of a committee which is deferring to the courts to interpret the language.
 "Defendants' notion of congressional adoption of their position is also rebutted by review of what Congress considered and what they actually adopted. The record demonstrates that defendants lobbied Congress, requesting that new language be added to the statute to specifically prohibit liens against liability insurance proceeds and to bar providers from collecting more than deductibles and coinsurance from beneficiaries that have received liability payments. That language was actually considered by Congress, but was not adopted. See Report to Accompany the Recommendations of the Committee on Ways and Means, House of Representatives (Sept. 1989), attached as Exh. 6 to plaintiffs' Cross-Motion for Summary Judgment. Instead, the Secondary Payer Provision was modified so it now reads:
 " '(A) IN GENERAL — Payment under this title may not be made, except as provided in subparagraph (B) [providing for conditional payments], with respect to any item or service to the extent that . . . (ii) payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) . . . under an automobile or liability insurance policy or plan (including a self-insured plan). . . .'
 "(emphasis added to designate the amendment) Omnibus Budget Reconciliation Act of 1989, H.R. 3299, 101st Cong. 1st Sess., 135 Cong. Rec. H9372 (daily ed. Nov. 21, 1989). Subparagraph B states:
" '(B) CONDITIONAL PAYMENT —
 " '(i) PRIMARY PLANS — Any payment under this title with respect to any item or service to which subparagraph (A) applies shall be conditioned on reimbursement to the appropriate Trust Fund established by this title when notice or other information is received that payment for such item or service has been or could be made under such subparagraph.
 " '(ii) ACTION BY UNITED STATES — [The United States may bring an action against any entity to recover payment].
 " '(iii) SUBROGATION RIGHTS — The United States shall be subrogated . . . to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan.
 " '(iv) WAIVER OF RIGHTS — The Secretary may waive (in whole or in part) the provisions of this subparagraph in the case of an individual claim if the Secretary determines that the waiver is in the best interests of the program under this title.'
 "Id. Defendants are correct in pointing out that this restructuring of the secondary payer provision confirms the Secretary's ability to make conditional payments even when a liability insurer is the primary insurer. Even though the statute allows the Secretary to make such conditional payments, it goes no further than the unamended statute to justify defendants' position that plaintiffs are required to present beneficiaries' bills to them first and ignore the ordering set in subparagraph (A).
 "The defendants' arguments in their motion for summary judgment go to the reasonableness of the Secretary's actions in promulgating this regulation under the statute. Because this court finds that the regulation is in direct contradiction of the statute, it need look no further at the Secretary's actions. The Secretary has promulgated these regulations in the name of protecting beneficiaries. Although that goal may be particularly important, the Secretary has other entities to protect and their protection may be in conflict with protecting beneficiaries. When Congress enacted the secondary payer provisions, it *Page 1217 
struck a balance between saving money and protecting beneficiaries. . . .
(Emphasis in original.)
As Sullivan illustrates, Congress originally intended for Medicare to be the primary payer for hospital and medical services provided to a Medicare beneficiary. The statutory framework even today envisions that when a health services provider bills Medicare, it agrees to accept the amount that Medicare will pay, and that once Medicare is billed a Medicare beneficiary will not be charged, either directly or indirectly, for items or services that the beneficiary is entitled to have paid. Of course, when Medicare pays, it becomes subrogated to the rights of the beneficiary and it may seek reimbursement from a beneficiary's settlement with a liability insurer.42 U.S.C. § 1395y(b)(2)(B). However, as the Sullivan court recognized, a statutory exception to Medicare's primary payer status is found in the "secondary payer" provision, set out in42 U.S.C. § 1395y(b)(2)(A). That provision provides, in pertinent part, that payment for a beneficiary's medical treatment cannot be made by Medicare "with respect to any item or service to the extent that . . . payment has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations) . . . under an automobile or liability insurance policy or plan (including a self insurance plan) or under no fault insurance." Thus, by virtue of the "secondary payer" exception, Congress has provided the statutory means by which a health services provider, which has provided medical treatment to a Medicare beneficiary, may obtain payment from a beneficiary's liability insurance proceeds, instead of from Medicare. The effect of the "secondary payer" provision is to force a health services provider to look to a liability insurer for payment, instead of to Medicare, when payment from a liability insurer "has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations)."42 C.F.R. § 411.50, defines "prompt or promptly" as follows:
 "Prompt or promptly, when used in connection with payment by a liability insurer means payment within 120 days after the earlier of the following:
 "(1) The date a claim is filed with an insurer or a lien is filed against a potential liability settlement.
 "(2) The date the service was furnished or, in the case of inpatient hospital services, the date of discharge."
The Sullivan court made it very clear that the Department of Health and Human Services and the Health Care and Financing Administration could not, by regulation, effectively write the "secondary payer" exception out of the statute and thereby prohibit recovery from a beneficiary's liability insurance proceeds. The Joiners do not take issue with Sullivan on this point; they argue, instead, that if the definition set out in42 C.F.R. § 411.50 is plugged into the statute (§ 1395y(b)(2)(A)), and applied under the facts of the present case, then the "secondary payer" exception is not available to Medical Center East because payment from the liability insurer was not made "promptly." In this respect, the Joiners argue, it makes no difference that Medical Center East promptly filed its lien on June 29, 1994, against any potential liability insurance payment. According to the Joiners, the statute required that the liability insurance payment either be made within 120 days from June 4, 1994 (the day of Joiner's discharge) or that the payment be reasonably expected to be made within 120 days from the day of discharge. Therefore, under the Joiners' interpretation of the statute, once the 120-day deadline for payment from the liability insurer had *Page 1218 
passed, any payment thereafter could not have been prompt, and could not reasonably have been expected to be prompt, as a matter of federal law. Therefore, the Joiners argue, after the 120-day period had passed, Frank Joiner was once again "covered" by Medicare and "entitled" to have Medicare pay his bill in accordance with its provider agreement with Medical Center East.
As was noted in Sullivan, courts must give great deference to a federal agency's interpretation of its controlling statute. If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute, that is, whether the agency's construction is natural and consistent with the statute. Although the "secondary payer" provision clearly prohibits a health services provider from billing Medicare when "payment has been made or can reasonably be expected to be made promptly" by a liability insurer, as "promptly" is defined in 42 C.F.R. § 411.50, the statute is not as clear as to whether a health services provider can continue to pursue full payment for its charges from a liability insurance settlement after the expiration of the 120-day period set out in § 411.50. We note that the Department of Health and Human Services at one point interpreted the statute as the Joiners contend — to prohibit a health services provider from pursuing liability insurance proceeds after the expiration of the 120-day period. See 42 C.F.R. § 411.54, which, in pertinent part, provides:
"(c) Basic rules —
". . . .
 "(2) Specific limitations. Except as provided in paragraph (d) of this section, the provider or supplier —
 "(i) May not bill the liability insurer nor place a lien against the beneficiary's liability insurance settlement for Medicare covered services.
 "(ii) May only bill Medicare for Medicare-covered services;
". . . .
"(d) Exceptions —
 "(1) Nonparticipating suppliers. The limitations of paragraph (c)(2) of this section do not apply if the services were furnished by a supplier that is not a participating supplier and has not accepted assignment for the services or has not claimed payment for them under § 424.64 of this chapter.
 "(2) Prepaid health plans. If the services were furnished through an organization that has a contract under section 1876 of the Act (that is, through an HMO or CMP), or through an organization that is paid under section 1833(a)(1)(A) of the Act (that is, through an HCPP) the rules of § 417.528 of this chapter apply.
 "(3) Special rules for Oregon. For the State of Oregon, because of a court decision, and in the absence of a reversal on appeal or a statutory clarification overturning the decision, there are the following special rules:
 "(i) The limitations of paragraph (c)(2) of this section do not apply if the liability insurer pays within 120 days after the earlier of the following dates:
 "(A) The date the hospital files a claim with the insurer or places a lien against a potential liability settlement.
 "(B) The date the services were provided or, in the case of inpatient hospital services, the date of discharge.
 "(ii) If the liability insurer does not pay within the 120-day period, the hospital must withdraw its claim or lien and comply with the limitations imposed by paragraph (c)(2) of this section."
(Emphasis added.) See, also, 42 C.F.R. § 489.20, which provides in part:
"The provider agrees to the following:
". . . .
 "(f) To maintain a system that, during the admission process, identifies any primary payers other than Medicare, so that incorrect billing and Medicare overpayments can be prevented.
 "(g) To bill other primary payers before billing Medicare except when the primary payer is a liability insurer and except as provided in paragraph (j) of this section.
". . . . *Page 1219 
 "(j) In the State of Oregon, because of a court decision, and in the absence of a reversal on appeal or a statutory clarification overturning the decision, hospitals may bill liability insurers first. However, if the liability insurer does not pay 'promptly,' as defined in § 411.50 of this chapter, the hospital must withdraw its claim or lien and bill Medicare for covered services."
(Emphasis added.) The emphasized portions of these regulations were apparently promulgated in response to the Bowen decision in Oregon. Although these regulations presently appear in the Code of Federal Regulations, the Department of Health and Human Services changed its interpretation of the statute afterSullivan. On November 13, 1991, Medicare's Associate Regional Administrator, Richard L. Warren, sent a letter to all "Part A B Medicare Contractors" that stated, in pertinent part, as follows:
 "Because of the number of questions the Regional Office staff has received regarding the recent American Hospital Association (AHA) vs. Sullivan lawsuit, we found it necessary to clarify HCFA's position regarding hospital and physician liens applicable to MSP liability cases. By clarifying our position, we believe that you in turn will be better able to advise your respective providers.
 "The provider (a hospital or a physician) has the choice of billing Medicare or filing a lien or billing the liability insurer directly for payment in MSP liability cases. If the provider bills Medicare first however, the provider must file an amended lien or an adjusted bill with the liability insurer for non-covered services, deductibles or coinsurance only as required by Federal Medicare law. The provider cannot bill for the difference between its charges and the Medicare primary payment as this is tantamount to double billing and a violation of their respective Medicare Participation Agreements. Such action would be grounds for immediate expulsion from the Medicare program.
". . . .
 "On the other hand, if a provider decides to bill the liability insurer or file a lien against settlement proceeds instead of billing Medicare, the provider is entitled to pursue its full charges. A provider must wait 120 days (after billing the liability insurer) before requesting a conditional primary payment from Medicare. Once the provider bills Medicare for a conditional primary payment, the provider must amend its lien and/or adjust its bill to the liability insurer for non-covered services, deductibles and coinsurance only. To do otherwise is double billing.
 "Because of the AHA vs. Sullivan decision, hospitals and physicians must decide to whom they should submit their bill first. Under no circumstances are hospitals or physicians allowed to bill Medicare and the liability insurer at the same time. If you discover such cases, you should document them and forward them to your Regional MSP Representative for further action.
 "We expect regulations on this subject to be published in the Federal Register and in the Medicare contractor manuals within a few months. Until such regulations are published, you should be guided by this letter and any future letters issued
from this office on this subject. It is very likely that this issue will be addressed by the Federal courts again in the future. If required by the courts, our instructions to you will be modified at that time. In the meantime, you are instructed to notify your respective providers of HCFA's position on this issue."
(Emphasis in original.)
On March 12, 1996, the Health Care Financing Administration, through Thomas E. Hoyer, its director of the Office of Chronic Care and Insurance Policy, sent an interdepartmental memorandum to all of its associate regional Medicare administrators, explaining the proper procedure to be followed when liability insurance is available to pay for a beneficiary's medical treatment. That memorandum, which was distributed on April 23, 1996, to all "Region IV Medicare Contractors" by Medicare's associate regional administrator, George F. Jacobs, read in pertinent part as follows:
 "The purpose of this memorandum is to address questions about what providers of services and supplies (as defined in *Page 1220 42 CFR 400.202 to include physicians) may charge beneficiaries when Medicare is secondary payer to liability insurance and how contractors (intermediaries and carriers) should handle incorrect collections by providers and suppliers when Medicare is secondary payer to liability insurance. These questions arose following our release of a memorandum on August 21, 1995, which stated our policy regarding the options available to providers and suppliers when Medicare is secondary to liability insurance. Please provide this information to your contractors and ask that they share it with providers and suppliers (including physicians).
 "CHARGES TO BENEFICIARIES FOR MEDICARE COVERED SERVICES
"REMINDERS:
 "Where a provider/supplier has reason to believe that it provided services to a Medicare beneficiary for which payment under liability insurance may be available, the provider/supplier:
 "Within the 120-day 'promptly' period, must bill only the liability insurer, unless it has evidence that the liability insurer will not pay within the 120 day promptly period. If it has such evidence, it may bill Medicare for conditional payment, provided it supplies documentation to support the fact that payment will not be made promptly.
 "After the 120-day promptly period has ended, may, but is not required to bill Medicare for conditional payment if the liability insurance claim is not finally resolved.
 "If it chooses to bill Medicare, it must withdraw claims against the liability insurer or a lien placed on the beneficiary's settlement.
 "If it chooses to continue its claim against the liability insurance settlement, it may not also bill Medicare.
 "The provider or supplier may not collect payment from the beneficiary until after the proceeds of liability insurance are available to the beneficiary. Liability insurance is not the primary payer until after payment is made by liability insurance."
(Emphasis in original.) The August 21, 1995, memorandum referred to in the March 12, 1996, memorandum stated:
 "The purpose of this memorandum is to explain current HCFA enforcement policy with respect to provider and supplier billing options in Medicare secondary payer to liability insurance situations.
 "As described in our May 24, 1995, conference call with your staff, HCFA's current enforcement policy is that where a provider/supplier has reason to believe that it provided services to a Medicare beneficiary for which payment under liability insurance may be available, the provider/supplier:
 "Within the 120 day 'promptly period,' must bill only the liability insurer, unless it has evidence that the liability insurer will not pay within the 120 day promptly period. If it has such evidence it may bill Medicare for conditional payment, provided it supplies documentation to support the fact that payment will not be made promptly.
 "After the 120 day promptly period has ended, may, but is not required to bill Medicare for conditional payment if the liability insurance claim is not finally resolved.
 "If it chooses to bill Medicare, it must withdraw claims against the liability insurer or a lien placed on the beneficiary's settlement.
 "If it chooses to continue its claim against the liability insurance settlement, it may not also bill Medicare.
 "This policy applies nationwide (including Oregon). HCFA expects to issue an interim final rule with comment period (IFC) that will revise 42 CFR 411.54 to conform to this policy. In the interim period before issuance of final regulations following analysis of the comments on the IFC, HCFA does not intend to terminate the agreements of providers because they are pursuing a claim against a liability insurer whom they believe to be the primary payer under Medicare law, so long as the billing conforms to this policy. *Page 1221 
 "Medicare timely filing limitations in 42 CFR 424 continue to apply. If a provider or supplier chooses not to bill Medicare during the Medicare filing period, it may not bill Medicare after this period has expired even if it is unable to collect from the proceeds of the liability insurance settlement.
 "This supersedes earlier statements of HCFA policy you may have received on this matter. We have attached background and rationale that explains this enforcement policy.
"BACKGROUND AND RATIONALE
 "Regulations at 411.54 require that the provider/supplier bill only Medicare and prohibit the provider/supplier from billing a liability insurer or placing a lien against a beneficiary liability insurance settlement, regardless of whether the billing occurs within or after the 120 day 'promptly' period defined at 411.50.
 "A Court decision invalidated these regulations in part. In American Hospital Association v. Sullivan, the Court found that a provider:
 "Has the right to pursue payment from the liability insurer within the 120 day 'promptly' period; and
 "Notwithstanding Federal regulations, has no obligation to bill Medicare if the Liability insurer has paid or can reasonably be expected to pay promptly.
 "Previously, the Court in Oregon Association of Hospitals v. Bowen, reached the same conclusion which is the basis for the special rule application in Oregon, found at 411.54(d)(3). During the AHA litigation, providers (except those in Oregon) were authorized by the Court, as an alternative to billing Medicare, to bill liability insurers without regard to the promptly period. The Court questioned why HCFA would want to require hospitals to bill Medicare after the promptly period expired, implying that such a policy undercuts the purpose for the MSP provisions. However, the Court's order explicitly addressed only billings during the promptly period. The regulations at 411.54 are currently facially incorrect, because, after modification by the AHA court rulings, their mandate applies only after the promptly period expires. In effect, they are enforceable similarly to the special rule that applies in Oregon.
 "We have decided to enforce the policy that was in effect during the AHA litigation, in which providers were authorized by the Court, as an alternative to billing Medicare, to bill liability insurers without regard to the promptly period. In addition, we have decided to apply this enforcement policy to suppliers (e.g., physicians and other entities that may bill Medicare) as well as providers and to apply this enforcement policy to providers in Oregon."
The interpretation that has now been placed on the statute by the Health Care Financing Administration, on behalf of the Department of Health and Human Services, is entirely permissible and is consistent with congressional intent — to cut Medicare's costs — and, we conclude, it is due to be followed in this instance. For this reason, we hold that Medical Center East had the right under federal law to obtain full payment of its charges from the proceeds of Frank Joiner's settlement, even though that settlement was reached more than 120 days after Joiner's discharge from the hospital. Therefore, the trial court did not err in holding that Medical Center East had a valid and enforceable lien.
We further note the Joiners' argument that Medical Center East did not file a proper request to have the trial court disburse the $14,778.76, and that it did not prove that those charges were reasonable, as required under § 35-11-370. However, the record indicates that Medical Center East made a request for disbursement in its brief in support of its summary judgment motion and that it made a prima facie showing that its charges were reasonable by submitting its "Notice of Hospital Lien," wherein Paul Burchfield, the director of patient accounts for Medical Center East, stated under oath that the claimed charges were reasonable. Because the Joiners presented no evidence to rebut that prima facie showing, we see no *Page 1222 
error on the part of the trial court in disbursing the funds.
For the foregoing reasons, the summary judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, COOK, BUTTS, and SEE, JJ. concur.
[1] Avis Joiner was apparently not treated by Medical Center East. Medical Center East argues that "[b]ecause there is no allegation that [it] treated Ms. Joiner, or had any express or implied agreement with her, she has no claim, direct or indirect, against [it], regardless of the validity of the Joiners' arguments about Medicare's rules." In light of our holding, we pretermit consideration of any other grounds upon which a summary judgment might be proper with respect to Avis Joiner.
[1] "This provision was amended in 1984, with the word 'promptly' inserted after the words 'to be made.' Pub.L. 98-369, § 2344(a)(1).
[2] "See, Regional Office Bulletin: Part A, No. 87-9, from John L. O'Hara, Jr., Associate Regional Administrator, Program Operations, Region IX, to All Part A Intermediaries, May 5, 1987 ('Question 1: May a hospital, or other Part A provider, bill a liability insurer instead of Medicare and collect up to its total charges? Answer 2: Yes; at the present time and in accordance with MIM 3419.3 a provider may collect up to its total charges directly from the liability insurer [emphasis in original].') Administrative Record, vol. I.
[3] "Providers have always been barred from billing the beneficiary directly under their provider agreement, and plaintiffs here do not challenge that aspect of the regulations. See 42 U.S.C. § 1395cc(a)(1)(A)."